No. 04-042

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 63

CONFEDERATED SALISH AND KOOTENAI TRIBES,

Petitioners and Respondents,

v.

BUD CLINCH, Director, Montana Department of Natural
Resources and Conservation, and THE DEPARTMENT OF
NATURAL RESOURCES AND CONSERVATION,

Respondents and Appellants.

APPEAL FROM:     The District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause BDV 01-253,
Honorable Jeffrey M. Sherlock, Presiding Judge

COUNSEL OF RECORD:

For Appellants:

Tim D. Hall (argued), Department of Natural Resources and Conservation,
Helena, Montana

For Respondents:

John B. Carter (argued), Tribal Legal Department, Pablo, Montana

James H. Goetz (argued), Goetz, Gallik & Baldwin, P.C., Bozeman,
Montana

For Amici Curiae:

Harley R. Harris (argued), Helena, Montana (Heart of Sky Ranch, et al.)

Donald D. MacIntyre, Helena, Montana (Lake County Commissioners)

Terryl T. Matt and David Gordon, Browning, Montana (Blackfeet Tribe)

John M. Shontz, Helena, Montana (Northwest Montana Association of Realtors)

Michael S. Kakuk, Helena, Montana (Montana Legislators)

Argued and Submitted:  January 12, 2005

Decided:   March 12, 2007

Filed:

_____
                          Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Bud Clinch, Director of the Montana Department of Natural Resources and Conservation (DNRC), and the DNRC appeal from the order of the First Judicial District Court, Lewis and Clark County, granting summary judgment in favor of the Confederated Salish and Kootenai Tribes (Tribes). We reverse and remand for further proceedings.

¶2     We consider the following issue on appeal:

¶3     Can DNRC process applications to change the use of state appropriative water rights on the Flathead Reservation prior to quantification of the Tribes' reserved rights?

## BACKGROUND

¶4     James and Katherine Axe, non-Indian owners of two appropriative water rights on the Flathead Indian Reservation (Reservation), applied to the DNRC to change the use of those water rights from irrigation to recreation so that they could operate a water ski pond. The Tribes brought suit against DNRC to enjoin it from processing the change application. The District Court granted a temporary restraining order followed by a preliminary injunction preventing DNRC from conducting any proceeding pertaining to the Axes' application. After unsuccessful negotiations between the Tribes and DNRC, the District Court ultimately granted summary judgment in favor of the Tribes and issued a permanent injunction. The District Court concluded that DNRC could not determine whether the Axes' proposed change would adversely affect the use of the Tribes' rights in the absence of a quantification of the Tribes' reserved rights. DNRC appeals.

3

STANDARD OF REVIEW

¶5 We articulated the standard of review for grants of summary judgment in *Grimsrud v. Hagel*, 2005 MT 194, ¶ 14, 328 Mont. 142, ¶ 14, 119 P.3d 47, ¶ 14 (citations and quotation marks omitted):

> This Court's review of a district court's grant of summary judgment is *de novo*. Our evaluation is the same as that of the trial court. We apply the criteria contained in Rule 56, M.R.Civ.P. According to this rule, the moving party must establish both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. If this is accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist. If the court determines that no genuine issues of fact exist, the court must then determine whether the moving party is entitled to judgment as a matter of law.

¶6 This Court reviews a district court's conclusions of law for correctness. *Galassi v. Lincoln County Bd. of Com'rs*, 2003 MT 319, ¶ 7, 318 Mont. 288, ¶ 7, 80 P.3d 84, ¶ 7.

DISCUSSION

¶7 **Can DNRC process applications to change the use of state appropriative water rights on the Flathead Reservation prior to quantification of the Tribes' reserved rights?**

¶8 In *State ex rel. Greely v. Confederated Salish & Kootenai Tribes*, 219 Mont. 76, 712 P.2d 754 (1985), this Court described the two kinds of water rights at issue here:

> State appropriative water rights and Indian reserved water rights differ in origin and definition.
>
> . . . .
>
> Appropriative rights are based on actual use. Appropriation for beneficial use is governed by state law. Reserved water rights are established by reference to the purposes of the reservation rather than to actual, present use

4

of the water. The basis for an Indian reserved water right is the treaty, federal statute or executive order setting aside the reservation.

*Greely*, 219 Mont. at 89-90, 712 P.2d at 762.

¶9      DNRC argues that the Axes have a fundamental constitutional right to change the use of their appropriative water rights. Additionally, DNRC contends that the District Court erred in granting summary judgment because genuine issues of material fact remained pertaining to whether the change of use would adversely affect the use of the Tribes' reserved water rights. In support of its argument, DNRC maintains that in § 85-2-402, MCA, the Legislature has specifically provided for the processing of water use change applications prior to a final adjudication of the Tribes' reserved rights.

¶10     The Tribes respond that their reserved water rights are senior to all state appropriative water rights on the Reservation and, further, that all state appropriative claims are merely "claims" and not "rights." Without a final quantification of the Tribes' reserved rights, the Tribes contend that it is impossible to determine whether a change in the use of an existing claim will adversely affect the use of the Tribes' rights under the standard in § 85-2-402(2)(a), MCA.[1] The Tribes also argue that change of use proceedings are improper piecemeal adjudications prohibited by the McCarran Amendment, codified at 43 U.S.C. § 666, and that they should not have to intervene in multiple change of use proceedings—

_____

[1]Section 85-2-402(2), MCA, reads in part:
      [T]he department shall approve a change in appropriation right if the appropriator proves by a preponderance of evidence that the following criteria are met:
             (a) The proposed change in appropriation right will not adversely affect the use of the existing water rights of other persons . . . .

which are separate from and in addition to a comprehensive adjudication of rights—in order to ensure that their rights are not infringed.

¶11 At oral argument, the parties focused on the McCarran Amendment's relevance to the issue before this Court, so we will begin our analysis there. After interpreting and applying the McCarran Amendment to the instant case, we will discuss the complex jurisprudence relating both to the Amendment and to tribal sovereignty, and we will apply that jurisprudence to this matter. Finally, we will conclude with a comment on the so-called "trilogy" of our cases—*Ciotti*, *Clinch*, and *Stults*[2]—that address closely related issues and explain what our holding here means in the context of those decisions.

## I. The McCarran Amendment.

¶12 Title 43, Section 666, United States Code (enacted July 10, 1952, c. 651, Title II, § 208(a)-(c), 66 Stat. 560.), commonly known as the McCarran Amendment due to its sponsorship by Nevada Senator Pat McCarran, reads as follows:

> § 666. Suits for adjudication of water rights
>
> (a) Joinder of United States as defendant; costs. Consent is given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit. The United States, when a party to any such suit, shall (1) be deemed to have waived any right to plead that the State laws are inapplicable or that the United States is not amenable thereto by reason of its sovereignty, and (2) shall be subject to the judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to

---

[2]*Matter of Beneficial Water Use Permits*, 278 Mont. 50, 923 P.2d 1073 (1996) (*Ciotti*); *Salish and Kootenai Tribes v. Clinch*, 1999 MT 342, 297 Mont. 448, 992 P.2d 244 (*Clinch*); *Salish and Kootenai Tribes v. Stults*, 2002 MT 280, 312 Mont. 420, 59 P.3d 1093 (*Stults*).

the same extent as a private individual under like circumstances: Provided, That no judgment for costs shall be entered against the United States in any such suit.

(b) Service of summons. Summons or other process in any such suit shall be served upon the Attorney General or his designated representative.

(c) Joinder in suits involving use of interstate streams by State. Nothing in this section shall be construed as authorizing the joinder of the United States in any suit or controversy in the Supreme Court of the United States involving the right of States to the use of the water of any interstate stream.

¶13     A plain reading of the statute's text indicates that the United States has waived its sovereign immunity so that it may be joined as a defendant when it is a necessary party in cases seeking to adjudicate or administer water rights in state courts.[3]  The United States Supreme Court has interpreted this waiver to extend to the Indian tribes, providing consent to determine in state court federal reserved water rights held on behalf of Indians.  *Colorado River Water Cons. Dist. v. U.S.*, 424 U.S. 800, 809, 96 S. Ct. 1236, 1242 (1976).  The Amendment's waiver is not for purposes of private suits against the United States or the Indian tribes; rather, it is limited to comprehensive state adjudications of water rights.  *Dugan v. Rank*, 372 U.S. 609, 618, 83 S. Ct. 999, 1005 (1963); *U.S. v. District Court for Eagle*

_____

[3]For McCarran purposes, administration of water rights can happen only after their adjudication.  "To come within § 666(a)(2), a suit must seek to enforce or administer rights of the sort covered by § 666(a)(1), already adjudicated." *Orff v. U.S.*, 358 F.3d 1137, 1143 n. 3 (9th Cir. 2004), citing *United States v. Hennen*, 300 F. Supp. 256, 263 (D. Nev. 1968).  "To administer a decree is to execute it, to enforce its provisions, to resolve conflicts as to its meaning, to construe and to interpret its language.  Once there has been such an adjudication and a decree entered, then one or more persons who hold adjudicated water rights can, within the framework of § 666(a)(2), commence among others such actions as described above, subjecting the United States, in a proper case, to the judgments, orders and decrees of the court having jurisdiction." *Hennen*, 300 F. Supp. at 263.

*County*, 401 U.S. 520, 525, 91 S. Ct. 998, 1002 (1971); *U.S. v. District Court for Water Div. No. 5*, 401 U.S. 527, 529, 91 S. Ct. 1003, 1005 (1971).

¶14	In support of their argument that change of use proceedings are improper "piecemeal" adjudications, the Tribes contend that, according to judicial interpretation of the McCarran Amendment,

> DNRC has no jurisdiction over the Tribes and their water rights except within the context of a general *inter sese* water rights adjudication that satisfies McCarran requirements. Absent a proper McCarran adjudication, the Tribes retain sovereign immunity from all DNRC proceedings. Greely, 219 Mont. 84-85, 712 P.2d at 759; Stults, ¶¶ 38-39.

It is not entirely clear what the Tribes mean. In the case at bar, the Tribes are not defendants, nor are they generally parties to DNRC proceedings that administer state appropriative rights; thus, to speak of the Tribes' sovereign immunity from such proceedings is inapt. Moreover, sovereign immunity is a doctrine that precludes a party from *suing* a sovereign government without that government's consent, *see Black's Law Dictionary* (8th ed. 2004), and it is not at all clear that DNRC's change of use proceedings are "suits." However, the above quotation expresses the sentiment that is a common thread throughout the Tribes' argument: that DNRC lacks authority to regulate state appropriative water rights held by non-Indians on fee land within the boundaries of the Reservation. Though not squarely addressed by the parties, we must address this issue of tribal sovereignty—which is broader than sovereign immunity—as a necessary predicate to deciding whether change of use proceedings of this type are permissible under Montana law. *See Leichtfuss v. Dabney*, 2005 MT 271, ¶ 37 n. 8, 329 Mont. 129, ¶ 37 n. 8, 122 P.3d 1220, ¶ 37 n. 8 ("'a court may consider an issue "antecedent to . . . and ultimately dispositive of" the dispute before it, even an issue the

8

parties fail to identify and brief.'" (quoting *United States Nat. Bank of Ore. v. Independent Ins. Agents of America, Inc.*, 508 U.S. 439, 447, 113 S. Ct. 2173, 2178 (1993))). If, by virtue of the Tribes' sovereignty, the State were to have no regulatory authority over water rights on non-Indian fee land on the Reservation, then Montana law on the subject would be irrelevant. *See Ciotti*, 278 Mont. at 65, 923 P.2d at 1082 ("In the absence of state jurisdiction to regulate or administer tribal water, compliance with the Water Use Act is immaterial." (Leaphart, J., concurring)).

¶15 Before embarking on our sovereignty analysis, we must clarify the law as it relates to the McCarran Amendment. The Tribes' argument and some of the language used by this Court on the subject in *Stults*, ¶¶ 20, 38-39, misconstrues the holding of *Colorado River* and conflates three concepts: federal abstention, sovereign immunity, and sovereignty.[4]

¶16 In *Colorado River*, the United States Supreme Court held that a federal district court, in deferring to a similar comprehensive state court proceeding then in progress, properly dismissed an action by the United States seeking to adjudicate water rights in several rivers and their tributaries. The Court gave the following rationale:

> Turning to the present case, a number of factors clearly counsel against
> concurrent federal proceedings. The most important of these is the McCarran

---

[4]The Tribes and the cited portions of *Stults* misappropriate terms used in *Colorado River* and *Arizona v. San Carlos Apache Tribe*, 463 U.S. 545, 103 S. Ct. 3201 (1983), describing DNRC proceedings as improper "piecemeal" proceedings or adjudications. As the following discussion demonstrates, *Colorado River* and *San Carlos Apache* use the term "piecemeal" to describe the potential for simultaneous federal and state adjudications of the same water rights. These cases make no reference to agency proceedings as "adjudications," and in no instance do they apply the term "piecemeal" to anything other than this potential federal-state duplication. *But cf. U.S. v. State of Or.*, 44 F.3d 758 (9th Cir. 1994) (holding that the McCarran Amendment waives sovereign immunity for administrative agency proceedings where they are necessary components of the comprehensive state adjudication).

9

Amendment itself. The clear federal policy evinced by that legislation is the avoidance of piecemeal adjudication of water rights in a river system. . . . The consent to jurisdiction given by the McCarran Amendment *bespeaks a policy* that recognizes the availability of comprehensive state systems for adjudication of water rights as the means for achieving these goals.

*Colorado River*, 424 U.S. at 819, 96 S. Ct. at 1247 (emphasis added). In a sequel to *Colorado River*, *Arizona v. San Carlos Apache Tribe*, 463 U.S. 545, 103 S. Ct. 3201 (1983), the Court held that federal district courts should dismiss suits brought by Indian tribes for the adjudication of water rights in favor of concurrent comprehensive state proceedings. The Court reiterated its rationale from *Colorado River*:

The McCarran Amendment, as interpreted in *Colorado River*, allows and encourages state courts to undertake the task of quantifying Indian water rights in the course of comprehensive water adjudications. Although adjudication of those rights in federal court instead might in the abstract be practical, and even wise, it will be neither practical nor wise as long as it creates the possibility of duplicative litigation, tension and controversy between the federal and state forums, hurried and pressured decisionmaking, and confusion over the disposition of property rights.

*San Carlos Apache*, 463 U.S. at 569, 103 S. Ct. at 3215. That the text of the McCarran Amendment was not determinative for either of the above holdings is evidenced by the fact that the United States and Indian tribes were *plaintiffs* in those cases. As noted above, the Amendment's waiver of immunity as stated in the text applies only when the United States or Indian tribes are joined as *defendants*.

¶17    Other than to apply the waiver to the Indian tribes, *see* ¶ 13, the United States Supreme Court did not consider in either *Colorado River* or *San Carlos Apache* the extent or quality of the immunity waived by the Amendment. Indeed, the Court did no statutory interpretation of the McCarran Amendment at all. *See San Carlos Apache*, 463 U.S. at 573,

10

103 S. Ct. at 3217 ("one may search in vain for any textual support for the Court's holding") (Stevens, J., and Blackmun, J., dissenting). Rather, it used the perceived public policy underlying the Amendment to fashion a new form of federal abstention doctrine. *See Colorado River*, 424 U.S. at 819, 96 S. Ct. at 1247 ("The clear *federal policy evinced* by that legislation is the avoidance of piecemeal adjudication of water rights in a river system." (Emphasis added.)); *San Carlos Apache*, 463 U.S. at 572, 103 S. Ct. at 3216 ("In [*Colorado River*] this Court recognized a narrow rule of abstention governing controversies involving federal water rights.") (Marshall, J., dissenting). The federal courts' abstention doctrine does not necessarily have any relevant relationship to a waiver of sovereign immunity because the two concepts are separate and distinct. As already mentioned, sovereign immunity precludes a party from suing a sovereign government without that government's consent, whereas abstention relates to when a court "may decline to exercise or postpone the exercise of its jurisdiction . . . ." *Colorado River*, 424 U.S. at 813, 96 S. Ct. at 1244. The connection that the Court in *Colorado River* and *San Carlos Apache* established between the two has only to do with a policy preference that comprehensive water rights adjudication should take place in state courts rather than federal courts.

¶18    Despite the Tribes' intimation to the contrary, that federal court policy preference, though relevant, is not necessarily determinative of the question whether DNRC's regulation of state appropriative water rights on the Reservation infringes on the Tribes' sovereignty, *i.e.*, the supreme dominion, authority, or rule that governments typically enjoy. *See Black's Law Dictionary* (8th ed. 2004); *see also City of Bisbee v. Cochise County*, 78 P.2d 982, 985-87 (Ariz. 1938). Though the doctrine of sovereign immunity is derived from sovereignty, *see*

11

*The Federalist No. 81* (Alexander Hamilton) ("It is inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent*."), it is a much narrower concept limited to the realm of lawsuits. As stated above, in the immediate context, issues of sovereignty—but not immunity—determine the extent to which the State, via DNRC, can regulate activities within the boundaries of the Reservation without offending the status of the Tribes as "'domestic dependent nations' that exercise inherent sovereign authority over their members and territories." *Oklahoma Tax Comm'n v. Potawatomi Tribe*, 498 U.S. 505, 509, 111 S. Ct. 905, 909 (1991). To resolve this tension between sovereigns, we turn now to examine jurisprudence more specifically addressing the relationship between state regulatory power and the right of Indian tribes to govern their lands.

## II. Sovereignty.

¶19    The Indian tribes have a unique status in our federal system:

> Though tribes are often referred to as "sovereign" entities, it was "long ago" that "the Court departed from Chief Justice Marshall's view that 'the laws of [a State] can have no force' within reservation boundaries." "Ordinarily," it is now clear, "an Indian reservation is considered part of the territory of the State."

*Nevada v. Hicks*, 533 U.S. 353, 361-62, 121 S. Ct. 2304, 2311 (2001) (brackets in original; citations omitted). This aberrant status has led to a complex body of jurisprudence attempting to describe the respective bounds of the authority of the Indian tribes and the States.

12

¶20 There exist two general and overlapping approaches to analyzing the interaction of state regulatory authority and tribal self-government.[5] The first, exemplified by *Montana v. United States*, 450 U.S. 544, 101 S. Ct. 1245 (1981), takes the perspective of the tribe and seeks to identify the scope of authority it possesses. The second, embodied in *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 100 S. Ct. 2578 (1980), takes the perspective of the state and seeks to prescribe the limits of its power.

¶21 In *Montana*, the United States Supreme Court considered whether the Crow Tribe had the power to regulate non-Indian fishing and hunting on reservation land owned in fee by nonmembers. The Court recognized that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe," but it nonetheless stated that:

> Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. [Citations omitted.] A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

---

[5]According to documents filed by the parties in the District Court, more than a decade ago the Tribes filed a claim in United States District Court for the District of Montana that is currently stayed by order of that court. The stay was upheld by *Confederated Salish v. Simonich*, 29 F.3d 1398 (9th Cir. 1994). According to the Tribes' brief in support of their motion for a temporary restraining order or injunction filed April 23, 2001, the federal court claim raises federal issues similar to those that we address here. We mention this federal proceeding only to note that it is appropriate for this Court to address issues of federal law, regardless of whether those claims have been raised elsewhere. *San Carlos Apache*, 463 U.S. at 571, 103 S. Ct. at 3216 ("State courts, as much as federal courts, have a solemn obligation to follow federal law."); *Greely*, 219 Mont. at 95, 712 P.2d at 765-66 ("We hold that state courts are required to follow federal law with regard to [Indian reserved] water rights."); *Simonich*, 29 F.3d at 1406 ("The state court is not enjoined from hearing and deciding the federal claims.").

*Montana*, 450 U.S. at 565-66, 101 S. Ct. at 1258. Applying this test, the Court concluded that "[n]o such circumstances" were present, *Montana*, 450 U.S. at 566, 101 S. Ct. at 1259, and that "regulation of hunting and fishing by nonmembers of a tribe on lands no longer owned by the tribe bears no clear relationship to tribal self-government or internal relations." *Montana*, 450 U.S. at 564, 101 S. Ct. at 1258. Accordingly, the Court held that the Crow Tribe could not prohibit hunting and fishing within the reservation by nonmembers of the Tribe on non-Indian fee land.

¶22   In *Bracker*, the United States Supreme Court considered whether Arizona's application of motor carrier license and use fuel taxes to a non-Indian logging company operating entirely on an Indian reservation was preempted by federal law. The Court stated that "there is no rigid rule by which to resolve the question whether a particular state law may be applied to an Indian reservation or to tribal members" because

> the tribes have retained a semi-independent position not as States, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the State within whose limits they resided.

*Bracker*, 448 U.S. at 142, 100 S. Ct. at 2583 (internal quotation marks and ellipsis omitted). The Court went on to articulate

> two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members. First, the exercise of such authority may be pre-empted by federal law. [Citations omitted.] Second, it may unlawfully infringe "on the right of reservation Indians to make their own laws and be ruled by them." [Citations omitted.] The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members.

14

*Bracker*, 448 U.S. at 142-43, 100 S. Ct. at 2583. Where "a State asserts authority over the conduct of non-Indians engaging in activity on the reservation" this test does not depend "on mechanical or absolute conceptions of state or tribal sovereignty," but it requires a "particularized inquiry into the nature of the state, federal, and tribal interests at stake[.]" *Bracker*, 448 U.S. at 144-45, 100 S. Ct. at 2584. The Court concluded that Arizona's authority to impose taxes was preempted by the comprehensive federal regulatory scheme governing logging on Indian reservations. *Bracker*, 448 U.S. at 148, 100 S. Ct. at 2586.

¶23 Because the present case concerns the State's regulation of activity on non-Indian land within the Reservation's boundaries, we conclude that the *Bracker* test is more pertinent, though *Montana* provides a useful backdrop.[6] *Cf. Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 126 S. Ct. 676, 680 (2005) ("But the *Bracker* interest-balancing test applies only where 'a State asserts authority over the conduct of non-Indians engaging in activity on the reservation.'" (quoting *Bracker*, 448 U.S. at 144, 100 S. Ct. at 2578)). This conclusion builds on and is congruent with our decision in *In re Skillen* in which we held that the *Bracker* test applies to resolve a "jurisdictional conflict regarding a regulatory matter . . . ." *In re Marriage of Skillen*, 1998 MT 43, ¶ 44, 287 Mont. 399, ¶ 44, 956 P.2d 1, ¶ 44 (differentiating *Bracker* from the test in *State ex rel. Iron Bear v. District Court*, 162 Mont. 335, 512 P.2d 1292 (1973), which applies to jurisdictional conflicts relating to adjudicatory matters).

---

[6]Though the Tribes issued two Tribal Revocable Water Permits to the Axes, the Tribes acknowledge that the permits were unenforceable, of no legal import, and used merely as a

¶24 The two cases most relevant to the issue here do not come from our own case law, however, but from the United States Court of Appeals for the Ninth Circuit, which has twice applied *Bracker* when considering whether states can regulate water on reservation lands.

¶25 In *Colville Confederated Tribes v. Walton*, 647 F.2d 42 (9th Cir. 1981), the Court examined whether the State of Washington could grant water permits to a non-Indian owner of allotted lands located within the No Name Basin on the Colville Reservation. Citing both *Montana* and *Bracker*, the Court concluded that Washington did not have authority to regulate these water rights:

> Where land is set aside for an Indian reservation, Congress has reserved it for federal, as opposed to state needs. Because the No Name System is located entirely within the reservation, state regulation of some portion of its waters would create the jurisdictional confusion Congress has sought to avoid.
>
> . . . .
>
> [W]e note that the state's interest in extending its water law to the reservation is limited in this case. Tribal or federal control of No Name waters will have no impact on state water rights off the reservation.

*Walton*, 647 F.2d at 53.

¶26 *Walton* stands in contrast to the Court's decision three years later in *United States v. Anderson*, 736 F.2d 1358 (9th Cir. 1984). In *Anderson*, the Court held that "the State [of Washington], not the Tribe, has the authority to regulate the use of excess Chamokane Basin waters by non-Indians on non-tribal, i.e., fee, land." *Anderson*, 736 F.2d at 1365. Again applying both *Montana* and *Bracker*, the Court stated, "Central to our decision is the fact that the interest of the state in exercising its jurisdiction will not infringe on the tribal right to self-

means of information-gathering by the Tribes. Thus, the issuance of these permits did not

16

government nor impact on the Tribe's economic welfare because [the Tribe's reserved] rights have been quantified . . . ." *Anderson*, 736 F.2d at 1366. However, a broader inquiry was necessary to resolve the question. Distinguishing *Walton*, the Court noted that the hydrology of the basins at issue in the two cases were significantly different in their size and impact. In *Walton*, "the stream in question was small, non-navigable, and located entirely within the reservation," whereas the Chamokane Creek originated outside of the Spokane Indian Reservation, formed part of the eastern boundary of the reservation, and then flowed away from the reservation and eventually to the Pacific Ocean. *Anderson*, 736 F.2d at 1366. In these circumstances, the Court concluded that "the State of Washington's interest in developing a comprehensive water program for the allocation of surplus waters weighs heavily in favor of permitting it to extend its regulatory authority to the excess waters, if any, of the Chamokane Basin." *Anderson*, 736 F.2d at 1366.

¶27 *Walton* was decided under the first prong of the *Bracker* test, preemption. *Anderson* was decided on the basis of the second, sovereignty. Despite the paucity of sovereignty analysis in *Walton* and the lack of preemption analysis in *Anderson*, one common factor appears to have weighed heavily in the Court's application of *Bracker*'s "particularized inquiry" of the interests at stake in each of the above cases: the degree to which regulation of the waters at issue affects water rights off the reservation. *See Walton*, 647 F.2d at 53 ("Tribal or federal control of No Name waters will have no impact on state water rights off the reservation."); *Anderson*, 736 F.2d at 1366 ("The weight of the state's interest depends, in

amount to "regulation" by the Tribes.

large part, on the extent to which waterways or acquifers [sic] transcend the exterior boundaries of Indian country.").

¶28 This commonality is consistent with the decision in *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 103 S. Ct. 2378 (1983), in which the United States Supreme Court articulated the principles that guided its consideration of "New Mexico's claim that it may superimpose its own hunting and fishing regulations on the Mescalero Apache Tribe's regulatory scheme," as those regulations related to nonmembers on the reservation. *New Mexico*, 462 U.S. at 336-37, 103 S. Ct. at 2388. The Court stated that in assessing the "interest asserted to justify state jurisdiction over a reservation . . . [a] State's regulatory interest will be particularly substantial if the State can point to off-reservation effects that necessitate state intervention." *New Mexico*, 462 U.S. at 336, 103 S. Ct. at 2387-88; *see also Rice v. Rehner*, 463 U.S. 713, 724, 103 S. Ct. 3291, 3298 (1983). Applying the *Bracker* test, the Court concluded that New Mexico's regulations were preempted by the "comprehensive tribal regulatory scheme . . . ." *New Mexico*, 462 U.S. at 344, 103 S.Ct. at 2392.

¶29 From the foregoing precedent, we conclude that two factual inquiries which are intertwined with the *Bracker* test will drive the legal determination of whether DNRC has the sovereign authority to process the change of use application at issue here. First, off-Reservation effects must be assessed. Second, the impact that the processing of these applications may have on the Tribes' political integrity, economic security, health, or welfare must be determined.

¶30 The first inquiry has two sides to it. In *Walton*, the Court noted that federal or tribal regulation of the waters at issue would have no impact on state rights off the reservation.

18

This aspect of the inquiry is not determinative in the present case, however, because neither the Tribes nor the federal government have asserted regulatory authority over the Axes' water rights. In *Anderson*, by contrast, where the hydrology of the basin was such that state rights to the basin's water were implicated both on the reservation and downstream of it, the Court implicitly concluded that an absence of state authority to regulate waters on the reservation in excess of tribal rights would adversely affect state water rights holders downstream. With respect to the Axes' change of use application, we simply do not know what effect such an absence of authority would have on other state water rights holders. Indeed, we do not even know, from the record before us, whether there are other state water rights holders downstream of the Axes, on or off the Reservation.

¶31    The second inquiry drives at the heart of the dispute between the Tribes and DNRC. To decide whether processing the Axes' change of use application will have some direct effect on the Tribes' political integrity, economic security, health, or welfare, we must first know—at the least—whether the change of use would adversely affect the Tribes' reserved water rights because, as has been said many times, water is the lifeblood of the West. *See, e.g., Walton*, 647 F.2d at 52 ("Especially in arid and semi-arid regions of the West, water is the lifeblood of the community."); *In re General Adjudication of All Rights to Use Water in Big Horn River Sys.*, 835 P.2d 273, 279 (Wyo. 1992) ("Water is the lifeblood of Wyoming.").[7] Whether the change of use would adversely affect the Tribes and whether such assertion of regulatory authority by the State would have a direct effect on the Tribes

19

are legal conclusions. However, these legal conclusions must emanate from a developed factual record, which is absent here.

¶32 As explained, these factual inquiries are intertwined with the *Bracker* test. We can, and do, conclude that the State's authority has not been preempted by federal or tribal interests because, as noted, neither the Tribes nor the federal government have asserted regulatory authority over the Axes' water rights. *Cf. Bracker*, 448 U.S. 136, 100 S. Ct. 2578 (pervasive federal regulatory scheme preempted state's authority to regulate). Thus, DNRC is not preempted from processing the Axes' change of use application. However, it is not at all clear whether this DNRC process would infringe on the Tribes' sovereignty under the second prong of *Bracker*. This prong, as we have intimated, is informed by the overlapping *Montana* test—that is, we must inquire whether the DNRC regulatory process at issue here would "threaten[] or ha[ve] some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." To properly resolve this sovereignty question, we need a more fully developed factual record addressing the matters discussed in ¶¶ 29-31, above.

**III. The "Trilogy."**

¶33 If the sovereignty analysis were to be resolved in the Tribes' favor, then there would be no need to consider whether Montana law authorizes change of use proceedings on the Reservation. However, on the other hand, if DNRC does not have authority according to state law to process the Axes' change of use application, then it would make no practical

---

[7]We acknowledge that this inquiry is similar to an application of the statutory standard in § 85-2-402(2)(a), MCA, *see* ¶ 10 n.1 and ¶¶ 39-40, but we express no opinion about whether

difference whether DNRC has sovereign authority, by virtue of the federal law discussed above, to do so. For this reason, we consider it necessary to evaluate whether DNRC is authorized by Montana law to process the Axes' application.

¶34 This Court has considered similar issues in three previous cases, *Ciotti*, *Clinch*, and *Stults*. In *Ciotti*, we held that applicants for new water use permits and for changes of use of water permits on the Reservation could not prove, by the terms of the Montana Water Use Act, Title 85, Chapter 2, MCA, that the proposed uses would not unreasonably interfere with the Tribes' rights until those rights became quantified. Thus, DNRC did not have authority under state law to grant or change water use permits on the Reservation until that quantification was completed. *Ciotti*, 278 Mont. at 61, 923 P.2d at 1080. The Legislature responded to our decision in *Ciotti* with Senate Bill 97 in which it amended several provisions of the Water Use Act and expressed its intent to negate *Ciotti*'s holding:

> The legislature intends that the Montana Supreme Court's decision in [*Ciotti*] be negated by the passage and approval of this bill. . . . It is the intent of the legislature that the statutory determinations for issuing new water use permits and authorizing changes do not require the adjudication of all water rights in the source of supply. The legislature recognizes the unique character and nature of water resources of the state. Because water is a resource that is subject to use and reuse, such as through return flows, and because at most times all water rights on a source will not be exercised to their full extent simultaneously, it is recognized that an adjudication is not a water availability study. Consequently, the legislature has provided an administrative forum for the factual investigation into whether water is available for new uses and changes both before and after the completion of an adjudication in the source of supply. To allow for orderly permitting in the absence of a complete adjudication in the source of supply, permits issued under this chapter are provisional. A provisional permit is subject to reduction, modification, or revocation by the department as provided in 85-2-313 upon completion of the general adjudication.

the inquiry in each context may lead to different outcomes.

21

1997 Laws of Mont., ch. 497, 2790-91.

¶35    In *Clinch*, we again considered whether DNRC could issue new water use permits, this time under the amended provisions of § 85-2-311, MCA, enacted in response to our holding in *Ciotti*. Specifically, our holding turned on whether water was "legally available" on the Reservation, and we again concluded that DNRC could not make such a determination because it was unknowable how the issuance of permits for new uses would affect the Tribe's rights until those rights were quantified. *Clinch*, ¶ 28.

¶36    *Stults* was the result of a dispute about the meaning of our decision in *Clinch*. DNRC argued there that *Ciotti* and *Clinch* applied only to surface water and not groundwater. *Stults*, ¶ 25. This Court disagreed, stating, "DNRC cannot process or issue beneficial water use permits on the Flathead Reservation until such time as the prior pre-eminent reserved water rights of the Tribes have been quantified." *Stults*, ¶ 37.

¶37    At issue in *Ciotti* were applications for new use permits as well as one application for a change in the use of an existing permit, *Ciotti*, 278 Mont. at 52, 923 P.2d at 1075, and our holding applied to both types of applications. *Ciotti*, 278 Mont. at 54 n. 1, 923 P.2d at 1076 n. 1. *Clinch* and *Stults* concerned only new use permits. However, the Legislature's efforts to negate *Ciotti* by amending the water use statutes and some of the language employed in the three cases have left it unclear whether this Court deems that a change in use of an existing permit necessarily commits the same offense under the current water use statutes to the Tribes' unquantified reserved rights as does the issuance of new use permits. We hold that it does not.

22

¶38 On its face, an application for a new use of water on the Reservation means that, if approved, more water will be taken from the available supply. By contrast, a change in use, by definition, means that no more water will be diverted than is currently. We acknowledge the point made in *Ciotti*, *Clinch*, and *Stults* that state appropriative rights are different in quality and character than the Tribes' reserved rights, *Ciotti*, 278 Mont. at 55-58, 923 P.2d at 1076-78, *Clinch*, ¶ 12, *Stults*, ¶ 28, and that the Tribes' rights may include non-consumptive rights, instream flow rights, or diversion rights, or all of the above. *See Greely*, 219 Mont. at 91-94, 712 P.2d at 763-65. However, we see no compelling reason to deprive a holder of a state water right—who is already using a given amount of water—of the opportunity to prove by a preponderance of the evidence that the proposed change will not adversely affect the use of other water rights, including the Tribes' reserved rights. It very well could be that a change in use would adversely affect the use of the Tribes' rights or that an applicant for a change of use cannot prove a lack of adverse effect on the use of the Tribes' unquantified rights. However, we are not prepared to hold that it is impossible, as a matter of law, for an applicant to meet that burden.

¶39 The Legislature has made it clear that DNRC should be able to process change of use applications. Section 85-2-402(1), MCA, reads in part as follows:

> In a change proceeding under this section, there is no presumption that an applicant for a change in appropriation right cannot establish lack of adverse effect prior to the adjudication of other rights in the source of supply pursuant to this chapter.

In the record of the District Court proceedings below there was testimony to the effect that it was possible for parties to demonstrate no adverse effect on the Tribes' reserved rights. We

23

express no opinion on such feasibility. This Court does, however, conclude that § 85-2-402, MCA, appropriately provides for no presumption to work against a water use permit holder who seeks to change the approved use.

¶40    Therefore, we hold that by determining that no presumption operates against a permit holder who seeks a change of use, the Legislature has acted within its constitutional prerogative. In *Clinch*, we stated that

> to issue [new] water use permits on the Flathead Reservation prior to the quantification of the Tribes pervasive reserved right requires use of water which may belong to the Tribe and would, therefore, violate Article IX, Section 3(1) of the Montana Constitution which protects existing water rights whether adjudicated or unadjudicated . . . .

*Clinch*, ¶ 27. By its nature, a permit's change of use does not necessarily "require use of water which may belong to the Tribe;" thus, without a further record, we cannot conclude that it offends Article IX, Section 3(1) of the Montana Constitution. However, nothing in our holding should be construed to prejudice the Tribes' claims to reserved water rights. Indeed, we emphasize that the Tribes need not participate in the DNRC process and that the Tribes are not bound by the DNRC's decisions. In addition, we do not mean to imply that a state water use permit holder can, in fact, prove by a preponderance of the evidence that a change in use will not adversely affect the use of the Tribes' rights. We merely conclude that a permit holder is afforded the opportunity to do so by virtue of § 85-2-402, MCA.

¶41    Because of our holding above, we need not address whether changing the use of a state appropriative water right is a fundamental constitutional right. In addition, we discern no merit in the Tribes' argument that all state appropriative rights on the Reservation are merely "claims" and not "rights." *See* Art. IX, Sec. 3(1), Mont. Const.; § 85-2-101(4), MCA.

24

CONCLUSION

¶42     Before DNRC can process the Axes' change of use application, the District Court must decide whether DNRC has the sovereign authority to conduct such proceedings. Central to the District Court's analysis will be a consideration of the off-Reservation effects involved in the State's assertion of regulatory authority or lack thereof and the impact the processing of the Axes' application may have on the Tribes' economic security, health, or welfare—including whether the change of use would adversely affect the Tribes' reserved water rights.

¶43     If it is established that DNRC has sovereign authority to process the application, the District Court must permit the Axes to attempt to prove by a preponderance of the evidence that the "proposed change in appropriation right will not adversely affect the use of the existing water rights of other persons," § 85-2-402(2)(a), MCA, including the Tribes' reserved rights.

¶44     Accordingly, we conclude that the District Court erred in granting summary judgment in favor of the Tribes.  Likewise, the permanent injunction was erroneously imposed and is hereby removed.

¶45     Reversed and remanded for further proceedings.


                                                    /S/ JIM RICE


We concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER

/S/ KATHERINE R. CURTIS
Honorable Katherine R. Curtis, District
Judge, sitting in place of Justice Morris
/S/ JEFFREY H. LANGTON
Honorable Jeffrey H. Langton, District
Judge, sitting in place of Justice Leaphart

Justice James C. Nelson, dissenting.

I

¶46    I dissent from the Court's Opinion for three reasons.  First, I disagree with the majority's conclusion that the DNRC is able to determine, *before* the Tribes' reserved water rights have been quantified, whether a proposed change to an existing water use on the Reservation will "adversely affect" those rights (*see* § 85-2-402(2)(a), MCA).  In my view, the District Court, which provided a cogent and thoughtful analysis of this issue, correctly concluded that the DNRC cannot make a determination that such a change should be authorized unless it knows what the protected rights of the Tribes are.

¶47    The majority's contrary conclusion lacks any corresponding explanation or analysis of how one can determine whether a proposed change in use will affect—let alone, adversely affect—water rights whose scope is unknown but whose nature on the Reservation is ubiquitous.  The majority merely posits that "a change in use, by definition, means that no more water will be diverted than is currently."  Opinion, ¶ 38.  The majority does not disclose whence it came by this definition, but the definition does not track the statutory language, which requires the change-of-use applicant to show that the use of other water rights will not be "adversely affect[ed]" by the proposed change, not merely that he or she will continue diverting the same amount of water.  The majority assumes that these two showings are equivalent.  They are not.  While an applicant might not divert any more water after a proposed change than he or she has diverted historically, the change in use still could increase or decrease the flow in a protected stretch of a stream, raise or lower a water table, artesian pressure, or water level in a protected area, or impede aboriginal practices.  For

27

instance, the change could adversely affect the use of water rights reserved by the Tribes for aboriginal hunting and fishing, which may require that a particular quantity of water is located (or not located) at a particular location. Indeed, the DNRC conceded this point in the District Court.

¶48 Consequently, the majority's revision to § 85-2-402(2)(a), MCA, such that it now requires a determination only that "no more water will be diverted than is currently," emasculates the statute's "adversely affect" prohibition and, in so doing, exposes the Tribes' reserved water rights to routine infringement by the DNRC with each change-of-use application that the DNRC approves on the Reservation pursuant to this standard. As a result, it can no longer be said that the Tribes' interests are being satisfactorily protected under Montana's Water Use Act.

¶49 In this regard, the Tribes point out that if the DNRC is permitted to conduct proceedings to change existing water uses on the Reservation, the Tribes "may be required to present extensive legal and factual cases literally thousands of times" in order to safeguard their unquantified reserved water rights against each proposed change. Not finding this position to be "compelling," Opinion, ¶ 38, the majority assures the Tribes that they "need not participate in the DNRC process" and that they "are not bound by the DNRC's decisions." Opinion, ¶ 40. This assurance, however, misses the point. By sanctioning a wholly inadequate method of evaluating change-of-use applications—the "no more water will be diverted than is currently" approach—the majority has, unfortunately, put the Tribes in the position of having to contest such applications as a matter of course and, thus, to defend their reserved water rights piecemeal.

28

¶50 My second point of disagreement with the Court's Opinion is that, beyond the majority's discussion of the "adversely affect" issue, the balance of the Opinion addresses an issue that is not before us. To be sure, I agree with the majority that it is necessary for this Court to address, as a threshold matter, whether the DNRC has jurisdiction to regulate waters within the exterior boundaries of the Reservation; however, resolution of this issue does not call for an analysis of "the interaction of state regulatory authority and tribal self-government," Opinion, ¶ 20. Indeed, such analysis is premature until two preliminary factual questions have been resolved. First, because the State has no regulatory authority over the Tribes' *reserved* water rights (*see* Part V-A, *infra*), we must know whether there are any *non-reserved* waters on the Reservation (excess or surplus waters not encompassed within the Tribes' reserved water rights) over which the State, by way of the DNRC, might exert regulatory power. If no such waters exist, then we need proceed no further; but if there are excess, non-reserved waters, the next logical question is whether the appropriation right under consideration is to such waters.

¶51 Only when both of these questions have been answered affirmatively is there reason to address issues of tribal sovereignty under the principles set forth in *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 100 S.Ct. 2578 (1980), and *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245 (1981). Of course, these two preliminary questions cannot be answered until the Tribes' senior reserved water rights have been quantified, for the obvious reason that one cannot ascertain whether non-reserved waters exist until one knows the

extent of the reserved waters. Thus, the majority's *sua sponte*[1] foray into tribal sovereignty law is premature and, as such, inapposite.

¶52    The water rights cases cited by the majority bear this out, though it appears that the majority has overlooked or simply ignored the crucial fact underlying each of these cases— namely, that the waters over which the state government sought to exert regulatory power were "surplus," i.e., waters that were not included in the tribes' *quantified* water rights. For instance, the court in *United States v. Anderson*, 736 F.2d 1358 (9th Cir. 1984) (cited by the majority at ¶¶ 26-27), referred to the waters in dispute no less than *eleven* times as "surplus" or "excess" waters. Moreover, "[c]entral" to the Ninth Circuit's conclusion that "the state may exercise its regulatory jurisdiction over the use of *surplus, non-reserved* Chamokane Basin waters by nonmembers on non-Indian fee lands within the Spokane Indian Reservation" was "the fact that the interest of the state in exercising its jurisdiction will not infringe on the tribal right to self-government nor impact on the Tribe's economic welfare *because those rights have been quantified*." *Anderson*, 736 F.2d at 1366 (emphases added). Unfortunately, the significance of this fact is lost on the majority.

¶53    It appears, furthermore, that the majority's extended dictum was prompted by and flows from a mistaken premise. The majority believes that the Tribes are claiming infringement of their *sovereignty* by the DNRC. *See* Opinion, ¶¶ 14, 18. But the Tribes have claimed no such thing. There is not a competition here to regulate water on the Reservation. Rather, the Tribes are claiming infringement of their *property*—namely, their reserved water

---

[1] *See* Opinion, ¶ 14 (acknowledging that the tribal sovereignty issue was "not squarely addressed by the parties"). Indeed, the DNRC states in its Opening Brief that "there is no

rights. They seek to enjoin the DNRC from approving applications to change an existing water use on the Reservation because, according to the Tribes, any such change could impinge upon their unquantified reserved water rights. Thus, it seems that the majority has simply misconstrued the pertinent issue at hand.

¶54 Lastly, I disagree with the majority that there are genuine issues of material fact needing resolution in the District Court. The factual issues identified in the majority's sovereignty analysis are not capable of resolution at this point in time, as just explained; and the question of whether or not the Axes' proposed changes to their existing uses of water will, in fact, adversely affect the Tribes' reserved water rights is not before us, given that the Axes are not parties to this suit (not to mention the fact that the Axes cannot possibly make a showing of no adverse effect until the Tribes' reserved water rights have been quantified). The only factual matter implicated by this case is how the DNRC determines lack of adverse effect in a change-of-use proceeding. The District Court took evidence on this question, and no genuine issues remain as to it. Furthermore, for the reasons which follow, the Tribes were entitled to judgment as a matter of law. Thus, I would affirm the District Court in all respects.

## II

¶55 The factual and procedural background of this case is fairly straightforward. James and Katherine Axe are non-Indians holding two putative state-law appropriation rights on the Flathead Indian Reservation. On July 21, 2000, they filed an application with the DNRC to change the place of use, purpose of use, and place of storage of these rights. Specifically,

implication of Tribal sovereignty" in this case.

they applied to convert an irrigation use (pasture and hay fields) into a recreational use in the form of an 11.75-surface-acre manmade water-ski pond.

¶56 The DNRC reviewed the Axes' application to determine that it was correct and complete and then publicly noticed it. Thereafter, the DNRC received objections to the application from the Tribes, the Flathead Joint Board of Control, and a number of persons holding putative state-law water rights that, allegedly, would be adversely affected by the Axes' proposed changes. Consequently, on February 23, 2001, the DNRC set the Axes' application for a contested case hearing (*see* § 85-2-309, MCA) to be held April 25, 2001. (Meanwhile, the Axes made their proposed changes, i.e., they filled the water-ski pond, though under § 85-2-402(1), MCA, an appropriator may not make a change in an appropriation right without the DNRC's approval.)

¶57 The Tribes initiated the instant action in the District Court to enjoin the DNRC from proceeding with the contested case hearing on the Axes' application and, more generally, from approving applications to change an existing water use on the Reservation. The Tribes explained that they were in negotiation with the Montana Reserved Water Rights Compact Commission to quantify their reserved water rights (*see* § 85-2-702, MCA) and that they were seeking with their request for injunctive relief "to maintain the status quo" until the negotiated quantification was complete. The Tribes also contended that if the DNRC were permitted to conduct individual proceedings to change existing water uses on the Reservation, the Tribes "may be required to present extensive legal and factual cases literally

32

thousands of times."[2]  The District Court held a hearing on April 23, 2001, and, the following day, granted a temporary restraining order, which restrained the DNRC from conducting any activities otherwise authorized by § 85-2-402, MCA, on the Reservation.

¶58     On May 16, 2001, the District Court held a hearing on the Tribes' motion for a preliminary injunction.  Given the focal point of the Tribes' motion—namely, that the DNRC cannot make the statutory determinations for approving change-of-use applications until the Tribes' reserved water rights have been quantified—the greater part of the hearing centered on the requirement set forth in § 85-2-402(2)(a), MCA, that an applicant prove that the proposed change will not "adversely affect" the use of existing water rights.

¶59     In addition to arguments from counsel on this subject, the court heard from Jack Stults, Administrator of the DNRC's Water Resources Division, who testified extensively concerning the process by which the DNRC evaluates and decides an application to change an existing water use.  Specifically, the DNRC determines whether the proposed change will be "consistent with [the appropriation right's] pattern of historic use in terms of its burden on the source, in terms of its consumptive use, in terms of the amount of water that [the applicant] uses."  Restated, the question the DNRC addresses is whether the change that is being contemplated "alters the amount that is taken out [of the source] and returned such that less is being returned."

---

[2] The DNRC has substantiated this concern.  In its Opening Brief, the DNRC acknowledges that "state administrative change of water use proceedings . . . may affect [the Tribes'] water rights."  And in response to questioning from this Court during oral argument, counsel for the DNRC indicated that the Tribes must file objections to change-of-use applications in order to preserve their interests and that the Tribes are, in counsel's view, bound by the DNRC's decision on a particular application, whether or not they objected to it.

33

¶60　As discussed in further detail below, Mr. Stults acknowledged that this consumptive- or quantity-based approach does not necessarily account for possible adverse effects on the *non-consumptive* uses to which the Tribes' reserved water rights may be put (e.g., hunting and fishing). On this basis, the Tribes argued that the DNRC's inability to make the "adversely affect" determination vis-à-vis the Tribes' as yet unquantified reserved water rights meant that the DNRC simply could not approve not only the change requested by the Axes, but also any other requested change to an existing water use on the Reservation, as this Court had already held with respect to the DNRC's issuance of *new* water use permits. *See Confederated Salish and Kootenai Tribes v. Clinch*, 1999 MT 342, ¶¶ 27-28, 297 Mont. 448, ¶¶ 27-28, 992 P.2d 244, ¶¶ 27-28.

¶61　The District Court granted the Tribes' motion on July 12, 2001. In so doing, the court noted that the DNRC had proffered a "full bucket" analogy for adverse effect analysis: "[I]f a bucket had a certain level of water in it prior to a suggested change, and that same amount of water was in the bucket after the change, the change should be authorized." The court observed that such an approach "is wanting when the ticklish issue of the Tribes' reserved and unquantified water rights is plugged into the equation." Quoting our decision in *In the Matter of the Application for Beneficial Water Use Permit Nos. 66459-76L, Ciotti; 64988-G76L, Starner; and Application for Change of Appropriation Water Right No. G15152-S76l, Pope* (hereinafter, "*Ciotti*"), 278 Mont. 50, 57, 923 P.2d 1073, 1077 (1996), the court observed that

> the right to water reserved to preserve tribal hunting and fishing rights is unusual in that it is nonconsumptive. A reserved right for hunting and fishing purposes consists of the right to prevent other appropriators from depleting the

stream waters below a protected level in any area where the nonconsumptive right applies. [Alteration and internal quotation marks omitted.]

Thus, given the unique nature of the Tribes' reserved water rights, the court found the DNRC's analytical framework to be "somewhat deficient" as applied to those rights:

> While the actual amount of water in a stream may ultimately remain constant before and after a proposed change[] (the DNRC's full bucket theory), a change in place of use of a water right may well result in a change in the amount of water in a particular area "depleting the stream waters below a protected level . . . where the nonconsumptive right applies." The question then becomes; if we do not know what the Tribes' protected level in an area is, how can a change be authorized that might diminish that protected level in a particular spot? Thus, although an applicant's change of use may not result in any diminution of the actual water flowing down the stream, it could very conceivably result, through its change of place of use, in a temporary lessening in the amount of water on a particular stretch of water. If that stretch of water is part of the Tribes' non-consumptive right to preserve tribal hunting and fishing rights, that could deplete the stream waters below a protected level. The DNRC cannot make a determination that such a change should be authorized unless it knows what the protected, non-consumptive right of the Tribes[] is throughout the stream. [Ellipsis in original.]

Accordingly, the court enjoined the DNRC from conducting any proceedings pertaining to the Axes' application. (This injunction was narrower than the court's temporary restraining order, which restrained "any activities otherwise authorized" by § 85-2-402, MCA, on the Reservation.)

¶62 Relying on "the same logic that supported the preliminary injunction," the Tribes filed a motion for summary judgment on October 23, 2001. In its response, the DNRC reiterated its position that it can make a no-adverse-effect determination on the Reservation without knowing the quantity or scope of the Tribes' reserved water rights because in a change-of-use proceeding, the DNRC does not need to know the "legal availability" of water but, rather,

35

needs only to ascertain whether the applicant's proposed change will create "additional impacts" on the source of supply.

¶63    On April 17, 2002, before the District Court had ruled on the Tribes' summary judgment motion, the Tribes filed a motion for limited stay of proceedings. The Tribes informed the court that they had recently proposed to the Montana Reserved Water Rights Compact Commission "an interim process for limited administration of domestic and municipal water use" on the Reservation. The Tribes requested the stay "to afford the Commission some 'breathing room' while it consider[ed] the Tribes' proposal." The court granted the stay.[3]

---

[3] During oral argument, the Tribes informed us that the Secretary of the Interior has placed a moratorium on the approval of tribal water codes. *See Cohen's Handbook of Federal Indian Law* § 19.04[4], at 1205 (Nell Jessup Newton et al. eds., 2005) (discussing this moratorium). No doubt, therefore, a negotiated process for administering water use on the Reservation is a desirable alternative to the "regulatory vacuum" that Amici Curiae Affected Landowners claim exists on the Reservation at present. *See*, *e.g.*, *Cohen's Handbook* § 19.04[4], at 1205 n.279 (noting that in 1986, the Department of the Interior approved the Fort Peck Tribal Water Code, authorized under a 1985 water-rights compact between the Fort Peck tribes and the State of Montana). Yet, according to the Tribes, the DNRC's "pernicious efforts" to regulate water use on the Reservation have "cast[] a cloud" over the negotiations between the Tribes and the Commission. Similarly, Amicus Curiae Blackfeet Tribe informs us that the DNRC's actions have "a definite chilling effect" on that tribe's continuing efforts to negotiate water rights with the Commission. "For the Blackfeet Tribe, it raises questions as to the good faith of the State in such negotiations if the primary water rights agency of the State continues to try to avoid decisions of its own Supreme Court that are favorable to tribal interests, and continues to seek to overturn those decisions through legislative changes advanced and supported by that State agency." Unfortunately, the majority's resolution of the case at hand will only further impede the tribes' negotiations—if not render them futile—and thereby delay the regulatory scheme desired by Affected Landowners, which cannot be realized until quantification of the Tribes' senior water rights is completed or an interim administrative process is agreed upon. Ironically, then, the DNRC's efforts to regulate Reservation waters have only frustrated, not advanced, Affected Landowners' interests.

¶64    In August 2003, counsel for the Tribes informed the District Court that a settlement had not been reached, and he requested that the court render judgment. On November 12, 2003, the court granted the Tribes' motion for summary judgment and issued a permanent injunction restraining the DNRC from conducting any proceedings pertaining to the Axes' change-of-use application. The court's reasoning was much the same as its reasoning in granting the preliminary injunction (set forth above).

III

A

¶65    The specific issue argued in the District Court, ruled on by the District Court, and appealed to this Court is as follows: Can the DNRC determine, as required by § 85-2-402(2)(a), MCA, that a proposed change to an existing water use on the Reservation (its point of diversion, place of use, purpose of use, and/or place of storage) will not "adversely affect" the Tribes' reserved water rights, though those rights have not yet been quantified?[4] This question has already been answered by this Court in the negative. Specifically, we held in *Ciotti* that an applicant's burden to prove lack of unreasonable interference (§ 85-2-311(1), MCA) or adverse effect (§ 85-2-402(2), MCA) cannot be satisfied until the Tribes' reserved water rights have been quantified by compact negotiation pursuant to § 85-2-702, MCA, or by a general *inter sese* water rights adjudication; thus, the DNRC may *not* issue new water

_____

[4] The DNRC also argues, at great length, that the Axes and all state-law water right holders have a "constitutional right" to change their point of diversion, place of use, purpose of use, and place of storage. Setting aside the issue of whether the DNRC has standing to raise this question on behalf of the Axes and state-law water right holders, I agree with the Court (*see* Opinion, ¶ 41) that its resolution is not necessary in the case at hand.

37

use permits pursuant to § 85-2-311 or authorize changes to existing water use permits pursuant to § 85-2-402 on the Reservation until that quantification is complete. *See Ciotti*, 278 Mont. at 54 n.1, 61, 923 P.2d at 1076 n.1, 1080.

¶66     Subsequent to this holding, however, the Legislature amended § 85-2-311 and § 85-2-402 with the stated intent of "negat[ing]" our *Ciotti* decision. *See Confederated Salish and Kootenai Tribes v. Clinch*, 1999 MT 342, ¶¶ 14-16, 297 Mont. 448, ¶¶ 14-16, 992 P.2d 244, ¶¶ 14-16; Laws of Montana, 1997, Ch. 497, Statement of Intent, at 2790. As a result, the question of whether the DNRC may issue new water use permits and authorize changes to existing water use permits on the Reservation, before the Tribes' reserved water rights have been quantified, was resurrected. In *Clinch*, we again answered this question in the negative—at least with respect to the issuance of *new* water use permits. *See Clinch*, ¶¶ 27-28; *accord Confederated Salish and Kootenai Tribes v. Stults*, 2002 MT 280, ¶¶ 28-29, 36-37, 312 Mont. 420, ¶¶ 28-29, 36-37, 59 P.3d 1093, ¶¶ 28-29, 36-37. But, unlike our decision in *Ciotti*, where we stated that our decision "applies equally" to § 85-2-311 (new water use permits) and § 85-2-402 (changes to existing water use permits) because "an applicant's burden of proof is essentially the same under either statute," *Ciotti*, 278 Mont. at 54 n.1, 923 P.2d at 1076 n.1, we did not so state in *Clinch*. Rather, we explicitly reaffirmed only that the DNRC may not issue *new* water use permits on the Reservation—a holding that the parties do not now dispute.[5]

_____

[5] *Ciotti* involved two applications for *new* water use permits and one application to *change* an existing water use permit (all on the Reservation). *See Ciotti*, 278 Mont. at 52, 923 P.2d at 1075. Thus, we necessarily addressed the DNRC's ability to process both types of application. *Clinch*, however, was an original proceeding in this Court not involving any

38

¶67    Thus, a question remains as to whether, under the amended statutory language, the showing an applicant must make is still "essentially the same under [§ 85-2-311 and § 85-2-402]." In other words, even though the DNRC may not issue new water use permits on the Reservation, may it nevertheless approve *changes* to existing water uses on the Reservation? This question represents the portion of our holding in *Ciotti* that we did not reaffirm explicitly in *Clinch*. *Compare Ciotti*, 278 Mont. at 54 n.1, 923 P.2d at 1076 n.1, *with Clinch*, ¶¶ 1, 27-28, *and Stults*, ¶¶ 6, 36-37.

¶68    The Tribes' position is that the DNRC may *not* approve such changes. More specifically, the Tribes allege that, as a matter of law, an applicant for a change in an existing water use on the Reservation still cannot prove that the proposed change will not "adversely affect" the Tribes' reserved water rights until those rights have been quantified. Accordingly, the Tribes maintain, it is not possible for the DNRC to make the requisite no-adverse-effect determination and, thus, the DNRC cannot approve *any* applications to change an existing water use on the Reservation.

¶69    When considered in context, this particular challenge to the DNRC's regulation of water use on the Reservation is relatively narrow. The Tribes are challenging only the DNRC's ability to make a particular determination under § 85-2-402, MCA. Yet, while this challenge is narrow, it nevertheless implicates a more fundamental and far-reaching question: whether the DNRC has jurisdiction to regulate waters within the exterior boundaries of the

---

particular type of application, and our analysis addressed the amended version of § 85-2-311 only. *See Clinch*, ¶¶ 1, 14-28; *but see Clinch*, ¶ 30 (Rodeghiero, Judge, dissenting) (noting that an affidavit provided to this Court by the DNRC pertained both to the permitting of new uses and to changes in existing uses).

Reservation in the first place. If it does not have such authority, then its approval of an application to change an existing use is void irrespective of whether the applicant was able to prove the requisite lack of adverse effect under § 85-2-402(2)(a). In his special concurrence in *Ciotti*, Justice Leaphart characterized this issue as a "threshold" inquiry. He argued that "[w]e cannot address the question of whether the applicants can comply with the requirements of the Water Use Act without making a threshold determination that the state had jurisdiction to apply the Water Use Act to the tribal waters in the first instance." *Ciotti*, 278 Mont. at 66, 923 P.2d at 1083 (Leaphart, J., specially concurring).

¶70   However, this jurisdictional question—the answer to which depends in large part on federal law—had been reserved to the federal courts by virtue of a lawsuit pending in the United States District Court for the District of Montana (No. CV-92-54-M-DWM) at the time we decided *Ciotti*. *See Ciotti*, 278 Mont. at 53, 923 P.2d at 1075; *Ciotti*, 278 Mont. at 65, 923 P.2d at 1082 (Leaphart, J., specially concurring). The Tribes had filed that lawsuit against the DNRC in May 1992 simultaneously with the filing of the *Ciotti* lawsuit in the Montana First Judicial District Court. Like *Ciotti*, the federal suit challenged the application of Montana's Water Use Act to Reservation waters; however, unlike *Ciotti*, in which the Tribes raised exclusively state-law claims, the federal suit raised exclusively federal-law claims. *See Ciotti*, 278 Mont. at 53, 923 P.2d at 1075; *Confederated Salish v. Simonich*, 29 F.3d 1398, 1401 (9th Cir. 1994). Specifically, the Tribes alleged in their federal complaint that the Water Use Act is preempted by federal law; that the DNRC's application of the Act to Reservation waters violates the McCarran Amendment and Fourteenth Amendment due process; and that the Act impairs the obligations set forth in the July 16, 1855 Treaty of

40

Hellgate, 12 Stat. 975, and thereby violates the Contract Clause (U.S. Const. art. I, § 10, cl. 1). (These claims are set forth in the Tribes' brief in support of their complaint for temporary restraining order and injunction filed in the District Court. *See also* Brief of Appellee at 18, *Confederated Salish v. Simonich*, 29 F.3d 1398 (9th Cir. 1994) (No. 93-35103).)

¶71     Contemporaneously with the filing of their federal lawsuit, the Tribes filed motions to stay the federal proceedings pursuant to *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643 (1941), and to reserve their right to litigate the foregoing federal claims in federal court pursuant to *England v. Louisiana State Bd. of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461 (1964), pending resolution of their state-law claims in the Montana courts. The United States District Court granted these motions, *see Simonich*, 29 F.3d at 1401, and the United States Court of Appeals for the Ninth Circuit sustained the district court's order, *see Simonich*, 29 F.3d at 1406, 1407. Consequently, the question of whether application of Montana's Water Use Act to Reservation waters violates federal law was—and still is— reserved to the federal courts. Indeed, the Tribes so notified both the District Court and this Court in the case at hand. Notwithstanding this reservation, however, it is both appropriate and necessary, for the reasons which follow, for this Court to address the threshold jurisdictional question heretofore left unanswered.

B

¶72     In *England*, the Supreme Court held that when a federal court abstains from deciding an issue of federal law to enable the state courts to address an antecedent state-law issue, the litigant may reserve his right to return to federal court for the disposition of his federal claim. *England*, 375 U.S. at 419-22, 84 S.Ct. at 467-68. The Court reasoned that

41

> [t]here are fundamental objections to any conclusion that a litigant who has
> properly invoked the jurisdiction of a Federal District Court to consider federal
> constitutional claims can be compelled, without his consent and through no
> fault of his own, to accept instead a state court's determination of those claims.
> Such a result would be at war with the unqualified terms in which Congress,
> pursuant to constitutional authorization, has conferred specific categories of
> jurisdiction upon the federal courts, and with the principle that "When a
> Federal court is properly appealed to in a case over which it has by law
> jurisdiction, it is its duty to take such jurisdiction . . . . The right of a party
> plaintiff to choose a Federal court where there is a choice cannot be properly
> denied."

*England*, 375 U.S. at 415, 84 S.Ct. at 464-65 (ellipsis in original, citation and footnote

omitted).

¶73    More recently, the Supreme Court explained the purpose of *Pullman* abstention in the

context of an *England* reservation:

> "Typical" *England* cases generally involve federal constitutional challenges to
> a state statute that can be avoided if a state court construes the statute in a
> particular manner. In such cases, the purpose of abstention is not to afford
> state courts an opportunity to adjudicate an issue that is functionally identical
> to the federal question. To the contrary, the purpose of *Pullman* abstention in
> such cases is to avoid resolving the federal question by encouraging a state-law
> determination that may moot the federal controversy.

*San Remo Hotel, L. P. v. City and County of San Francisco*, 545 U.S. 323, 339, 125 S.Ct.

2491, 2502 (2005) (footnote omitted).

¶74    A litigant who has reserved a federal claim must inform the state courts what that

claim is, so that those courts may construe the state-law issue in light of the federal claim.

*England*, 375 U.S. at 420, 84 S.Ct. at 467. (As noted earlier, the Tribes did so in the case at

hand. *See* ¶ 70, *supra*.) However, the litigant is in no event to be denied his right to return to

the federal court, unless it clearly appears that he freely and without reservation submitted his

federal claim for decision by the state courts, litigated it there, and had it decided there. *England*, 375 U.S. at 419, 421, 84 S.Ct. at 467, 468.

¶75    The Supreme Court noted that "the parties cannot prevent the state court from rendering a decision on the federal question if it chooses to do so." *England*, 375 U.S. at 421, 84 S.Ct. at 467. But the Court also presumed that "state courts, sharing the abstention doctrine's purpose of furthering the harmonious relation between state and federal authority, will respect a litigant's reservation of his federal claims for decision by the federal courts." *England*, 375 U.S. at 421 n.12, 84 S.Ct. at 468 n.12 (citation and internal quotation marks omitted). Moreover, the Court noted that when a reservation has been made, the right to return to the federal court "will in all events be preserved" (unless the litigant voluntarily and fully litigated his federal claims in the state courts despite the reservation). *England*, 375 U.S. at 421-22, 84 S.Ct. at 468. This suggests that a decision rendered by the state court on the reserved federal claims will be in the nature of an advisory opinion. *See*, *e.g.*, *28 East Jackson Enterprises, Inc. v. Rosewell*, 380 N.E.2d 895 (Ill. App. 1978).

¶76    At the same time, however, it seems unlikely that the Supreme Court contemplated that an *England* reservation would prevent a state court or administrative agency from addressing the question of its own jurisdiction over a particular case or controversy—even when that determination requires the state court or administrative agency to interpret federal law, as in the case at hand. Indeed, such an understanding of *England* would conflict with the Supreme Court's recent pronouncement in *Arbaugh v. Y & H Corp.*, 546 U.S. 500, ____, 126 S.Ct. 1235, 1244 (2006), that "courts, including this Court, have *an independent obligation* to determine whether subject-matter jurisdiction exists, even in the absence of a

43

challenge from any party" (emphasis added). Jurisdiction involves the fundamental power and authority of a court or an administrative agency to determine and hear a case or issue. *Arbaugh*, 546 U.S. at ____, 126 S.Ct. at 1244; *Stanley v. Lemire*, 2006 MT 304, ¶ 30, 334 Mont. 489, ¶ 30, 148 P.3d 643, ¶ 30 (citing *State v. Diesen*, 1998 MT 163, ¶ 5, 290 Mont. 55, ¶ 5, 964 P.2d 712, ¶ 5); *Auto Parts v. Employment Relations Div.*, 2001 MT 72, ¶ 38, 305 Mont. 40, ¶ 38, 23 P.3d 193, ¶ 38. Accordingly, jurisdiction can never be forfeited or waived, and questions of jurisdiction may be addressed *sua sponte*. *Arbaugh*, 546 U.S. at ____, 126 S.Ct. at 1244; *Stanley*, ¶ 32; *State v. Reeder*, 2004 MT 244, ¶ 4, 323 Mont. 15, ¶ 4, 97 P.3d 1104, ¶ 4.

¶77   It would contravene these principles to ignore the jurisdictional question implicated here. Neither this Court nor the DNRC may presume that the State has the power to regulate waters on the Reservation. Likewise, the DNRC may not proceed in the possible absence of authority simply because the question of its jurisdiction is on hold in the United States District Court. The State either has jurisdiction over Reservation waters or it does not; and if it does not, any regulatory action taken with respect to those waters is void. If anything, the abstention doctrine's purpose of " 'furthering the harmonious relation between state and federal authority,' " *England*, 375 U.S. at 421 n.12, 84 S.Ct. at 468 n.12 (quoting *Pullman*, 312 U.S. at 501, 61 S.Ct. at 645), is *hindered* when state courts and administrative agencies are restrained by an *England* reservation from addressing a question of their own subject-matter jurisdiction.

¶78   For these reasons, it is essential that we address, as a threshold matter, whether the DNRC has jurisdiction over waters within the exterior boundaries of the Reservation. As

Justice Leaphart observed in *Ciotti*, "[i]n the absence of state jurisdiction to regulate or administer tribal water, compliance with the Water Use Act is immaterial." *Ciotti*, 278 Mont. at 65, 923 P.2d at 1082 (Leaphart, J., specially concurring).

C

¶79    The majority likewise concludes that we must address this threshold jurisdictional question; however, in reaching this conclusion, the majority proffers merely that "it is appropriate for this Court to address issues of federal law, regardless of whether those claims have been raised elsewhere." Opinion, ¶ 20 n.5. Given the implications of our doing so in the face of an *England* reservation, I must dispute the majority's broad, unqualified statement. Our addressing certain federal-law issues in this case, notwithstanding the Tribes' *England* reservation, is warranted due to our "independent obligation to determine whether subject-matter jurisdiction exists," *Arbaugh*, 546 U.S. at ____, 126 S.Ct. at 1244, not because of some categorical principle lacking any deference to the *England* doctrine whatsoever.

¶80    Notably, the authorities cited by the majority do not support the majority's broad assertion. For one thing, neither *Arizona v. San Carlos Apache Tribe of Arizona*, 463 U.S. 545, 103 S.Ct. 3201 (1983), nor *State ex rel. Greely v. Confederated Salish and Kootenai Tribes*, 219 Mont. 76, 712 P.2d 754 (1985), involved an *England* reservation.[6] And for another, the maxim that state courts have a solemn obligation to follow federal law in Indian water rights cases (*see* Opinion, ¶ 20 n.5) is not authority for a state court to reach a federal

---

[6] The same is true of *Leichtfuss v. Dabney*, 2005 MT 271, 329 Mont. 129, 122 P.3d 1220, on which the majority apparently relies as an alternative ground for addressing federal-law issues in this case. *See* Opinion, ¶ 14 (citing *Leichtfuss*, ¶ 37 n.8).

claim that otherwise is not properly before the court.  (Indeed, we appear to be *ignoring* federal law—specifically *England*—by analyzing federal-law issues that the Tribes have specifically reserved to the federal courts.)  In this regard, the majority's reasoning—that we may address issues of federal law because we are required to follow federal law—is circular.  We have no need to follow federal law unless we properly have before us an issue involving federal law, and that is the question here—one which the majority fails to answer.

¶81     The third case cited by the majority—*Simonich*—is at least relevant to the *England* reservation issue.  In *Simonich*, the Ninth Circuit stated as follows:

> The state court is not enjoined from hearing and deciding the federal claims.  The *England* reservation order simply reserves to the federal court jurisdiction to decide the federal claims.  It gives *the Tribes* the option of presenting all their claims to the state court or waiting and presenting their federal claims to the federal court after the state litigation ends.

*Simonich*, 29 F.3d at 1406 (emphasis added).  The majority selectively quotes the first sentence of this passage (*see* Opinion, ¶ 20 n.5), leaving out the crucial clarifying language which follows.  The federal court has jurisdiction to decide the federal claims unless and until *the Tribes* exercise their option to present those claims to the state courts, which the parties agree the Tribes have not done in this case.  *See also Instructional Systems, Inc. v. Computer Curriculum Corp.*, 35 F.3d 813, 821 (3rd Cir. 1994) ("It is the actions of the displaced litigant which are controlling.").

¶82     The Supreme Court assumed in *England* that "state courts, sharing the abstention doctrine's purpose of furthering the harmonious relation between state and federal authority, will respect a litigant's reservation of his federal claims for decision by the federal courts." *England*, 375 U.S. at 421 n.12, 84 S.Ct. at 468 n.12 (citation and internal quotation marks

omitted). Because we are not doing so here, a detailed explanation of why is required. Unfortunately, the majority has declined to provide one.

IV

¶83 For purposes of analyzing the threshold question of whether the DNRC has jurisdiction over Reservation waters, it is essential first to set forth the fundamental principles of Indian reserved water rights. In *State ex rel. Greely v. Confederated Salish and Kootenai Tribes*, 219 Mont. 76, 712 P.2d 754 (1985), we explained that state appropriative water rights and Indian reserved water rights differ in origin and definition. *Greely*, 219 Mont. at 89, 712 P.2d at 762. For one thing, state-created water rights are defined and governed by state law, whereas Indian reserved water rights are created or recognized by the federal treaty, statute, agreement, or executive order establishing the Indian reservation. *Greely*, 219 Mont. at 89, 90, 712 P.2d at 762.

¶84 Furthermore, state appropriative water rights are based on actual use. We explained this requirement as follows:

> Most western states, including Montana, adopted the prior appropriation doctrine under which water is apportioned on the basis of use. "As between appropriators, the first in time is the first in right." Section 85-2-401(1), MCA. An appropriator is generally entitled to a specified quantity of water so long as actual, beneficial use is made of the water. See § 85-2-404, MCA. Generally, an appropriator of a state-created right must divert, impound or withdraw water to appropriate. See §§ 85-2-102(1) & 85-2-234(5)(g), MCA.

*Greely*, 219 Mont. at 89, 712 P.2d at 762. Indian reserved water rights, by contrast, are neither created by use nor lost by nonuse. In other words, they may exist without a present or actual use. *Greely*, 219 Mont. at 90, 712 P.2d at 762. Such rights fall generally into two categories: those reserved to carry out the purposes of the reservation (e.g., transforming the

47

Indians into agrarians) and those reserved to maintain preexisting uses or aboriginal practices (e.g., fishing, hunting, gathering, pasturing). *See Cohen's Handbook of Federal Indian Law* § 19.02, at 1171-73 (Nell Jessup Newton et al. eds., 2005); Michael C. Blumm, *Reserved Water Rights*, in *4 Waters and Water Rights* §§ 37.02-37.02(a)(2), at 37-21 to 37-28 (Robert E. Beck ed., 1991 ed., Matthew Bender 2003); Judith V. Royster, *Winters in the East: Tribal Reserved Rights to Water in Riparian States*, 25 Wm. & Mary Envtl. L. & Policy Rev. 169, 173-79 (2000).

¶85    The former—Indian reserved water rights for reservation purposes—"spring from the act of reserving lands for particular purposes, typically transforming nomadic Indians into productive agrarians."   Blumm, *Reserved Water Rights*, § 37.01(b)(2), at 37-13.   This implied-reservation-of-water doctrine originated in *Winters v. United States*, 207 U.S. 564, 28 S.Ct. 207 (1908), wherein the Supreme Court held that the 1888 agreement that resulted in the creation of the Fort Belknap Indian Reservation implied a reservation of water to accomplish the purposes of the treaty agreement. *See Winters*, 207 U.S. at 575-77, 28 S.Ct. at 211-12; *see also Greely*, 219 Mont. at 89, 712 P.2d at 762.  In reaching this conclusion, the Court first noted that in entering into the agreement, it was the policy of the government and the desire of the Indians to change from a nomadic to a pastoral people.  Yet, the lands on which they were to settle were arid and, without irrigation, "practically valueless." *Winters*, 207 U.S. at 576, 28 S.Ct. at 211.  The Court questioned, rhetorically, whether the Indians, though they "had command of the lands and the waters—command of all their beneficial use, whether kept for hunting, and grazing roving herds of stock, or turned to agriculture and the arts of civilization"—would have reduced the area of their occupation and simultaneously

48

given up the waters which made it valuable or adequate. *Winters*, 207 U.S. at 576, 28 S.Ct. at 211 (internal quotation marks omitted). In deciding between two inferences, one of which would support the purpose of the agreement between the Indians and the government and the other which would impair or defeat it, and mindful of the rule of interpretation of agreements and treaties with the Indians, under which ambiguities occurring will be resolved from the standpoint of the Indians, the Court concluded that the Indians did not intend to relinquish their right to water sufficient to sustain them on the reserved land. *Winters*, 207 U.S. at 576-77, 28 S.Ct. at 211.

¶86 Indian reserved water rights for reservation purposes, therefore, are those which were reserved implicitly by the agreement establishing the reservation so that the purposes for which the land was set aside can be fulfilled. *See Greely*, 219 Mont. at 89-90, 712 P.2d at 762. As such, they are defined by reference to the purposes of the reservation—e.g., agriculture; grazing roving herds of stock; developing, preserving, producing, or sustaining food and other resources; providing a livelihood; and "the arts of civilization." *See Greely*, 219 Mont. at 89-90, 92-93, 712 P.2d at 762, 764-65; *Winters*, 207 U.S. at 576, 28 S.Ct. at 211; *see also United States v. Anderson*, 736 F.2d 1358, 1362 (9th Cir. 1984) (observing that the establishment of an Indian reservation implies a right to sufficient unappropriated water to fulfill the purposes of that reservation, and that such tribal reserved "*Winters* rights" vest on the date of the creation of the Indian reservation (citing *United States v. New Mexico*, 438 U.S. 696, 698-700, 98 S.Ct. 3012, 3013-14 (1978), and *Winters*, 207 U.S. at 576-78, 28 S.Ct. at 211-12)). Again, as noted above, such rights are not limited to actual, present uses of the

49

water; rather, they may include future needs and uses. *Greely*, 219 Mont. at 90, 93, 712 P.2d at 762, 765.

¶87    Indian reserved water rights for aboriginal practices, by contrast, preserve uses of water that existed *before* the creation of the reservation. *Greely*, 219 Mont. at 92, 712 P.2d at 764. As we explained in *Greely*, "[u]ninterrupted use and occupation of land can create 'aboriginal title.' " *Greely*, 219 Mont. at 90-91, 712 P.2d at 763 (citing *United States v. Klamath Indians*, 304 U.S. 119, 122-23, 58 S.Ct. 799, 801 (1938), and *United States v. Adair*, 723 F.2d 1394, 1413 (9th Cir. 1983)). This "aboriginal title" includes "an aboriginal right to the water used by the Tribe as it flowed through its homeland." *Adair*, 723 F.2d at 1413. Thus, "aboriginal-Indian reserved water rights exist from time immemorial and are *merely recognized* by the document that reserves the Indian land." *Greely*, 219 Mont. at 97, 712 P.2d at 767 (emphasis added); *accord Adair*, 723 F.2d at 1414 ("The [Klamath Tribe's aboriginal water] rights were not created by the 1864 Treaty, rather, the treaty confirmed the continued existence of these rights."). Indeed, "[t]reaties do not implicitly diminish aboriginal holdings." *Greely*, 219 Mont. at 90, 712 P.2d at 763. To the contrary, "[a]n Indian reservation will be defined to protect any pre-existing possessory rights of the Indians unless a contrary intent clearly appears in the document or statute that created the reservation." *Greely*, 219 Mont. at 91, 712 P.2d at 763. These principles derive from the fact that " 'the treaty is not a grant of rights to the Indians, but a grant of rights from them—a reservation of those not granted.' " *Greely*, 219 Mont. at 90, 712 P.2d at 763 (quoting *Adair*,

50

723 F.2d at 1412-13, in turn quoting *United States v. Winans*, 198 U.S. 371, 381, 25 S.Ct. 662, 664 (1905)).[7]

¶88   An Indian reserved water right for aboriginal purposes is "unusual" in that it commonly is "non-consumptive." *Adair*, 723 F.2d at 1411; *Greely*, 219 Mont. at 93, 712 P.2d at 764.  In *Adair*, the Ninth Circuit explained this unusual nature while discussing a water right reserved to further a tribe's hunting and fishing purposes, as follows:

> The holder of such a right is not entitled to withdraw water from the stream for agricultural, industrial, or other consumptive uses (absent independent consumptive rights).  Rather, the entitlement consists of *the right to prevent other appropriators from depleting the streams waters below a protected level in any area where the non-consumptive right applies*.  In this respect, the water right reserved for the Tribe to hunt and fish has no corollary in the common law of prior appropriations.

*Adair*, 723 F.2d at 1411 (emphasis added, citation omitted).  Thus, a reservation of the right to continue an aboriginal practice concomitantly reserves the right to water sufficient in quantity to ensure that the practice does in fact continue.  This category of rights plays a central role in the Tribes' contention in the instant case that the DNRC cannot make a no-adverse-effect determination until the Tribes' reserved water rights have been quantified.

¶89   The origin of the Tribes' reserved water rights is the July 16, 1855 Treaty with the Flatheads, &c. (commonly referred to as the Treaty of Hellgate), 12 Stat. 975, reprinted in 2 Kappler, *Indian Affairs: Laws and Treaties*, 722-25 (1904).  According to the Tribes, they "ceded to the United States millions of acres of their aboriginal homelands and in exchange

---

[7] Recognition of Indian reserved water rights for aboriginal practices is sometimes traced to *Winans*.  *See* Blumm, *Reserved Water Rights*, § 37.01(b), at 37-6 to 37-7, and § 37.02, at 37-21; Royster, 25 Wm. & Mary Envtl. L. & Policy Rev. at 177-78.

reserved the Flathead Indian Reservation for the 'exclusive use and benefit of said confederated tribes as an Indian reservation' in perpetuity" (quoting Article 2 of the Treaty of Hellgate). The Treaty of Hellgate secured the Tribes' aboriginal fishing, hunting, gathering, and pasturing rights[8] and the Tribes' implied reserved water rights under the *Winters* doctrine "to accomplish the purposes of the treaty agreement," *Greely*, 219 Mont. at 89, 712 P.2d at 762. These rights, however, have not yet been quantified; in other words, the precise quantity or scope of water encompassed by the Tribes' express fishing, hunting, gathering, and pasturing rights and the precise quantity necessary to fulfill the purposes of the reservation have not yet been determined. (As noted above, the Tribes have been in negotiations with the Montana Reserved Water Rights Compact Commission to do so, but as far as the record before us discloses, those negotiations are still ongoing.)

V

¶90    Turning now to the threshold jurisdictional question, state regulatory authority over waters within the exterior boundaries of the Reservation depends on the type of water right at issue. Here, the DNRC's regulatory action is directed at putative state-law water rights held by non-Indians (the Axes); however, because the Axes' rights postdate the 1855 Treaty of

---

[8] Article 3 of the Treaty of Hellgate provides, in relevant part: "The exclusive right of taking fish in all the streams running through or bordering said reservation is further secured to said Indians; as also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory, and of erecting temporary buildings for curing; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land."

Hellgate,[9] and because the Tribes' reserved water rights have not yet been quantified, it is not possible at present to know whether the Axes' rights are, in actual fact, "empty" rights to waters that are encompassed within the Tribes' reserved water rights (as opposed to rights to non-reserved—i.e., excess or surplus—waters on the Reservation).

¶91　But even if the Axes' water rights are, in actual fact, to non-reserved waters, the Tribes have suggested that the DNRC's assertion of regulatory authority over such rights is concomitantly an unlawful assertion of regulatory authority over the Tribes' unquantified reserved water rights.  Essentially, they allege that the DNRC's approval of an application to change an existing water use on the Reservation necessarily constitutes a determination of "the competing existing Tribal water right[s]."  As a result, in the Tribes' view, the DNRC is engaged in, and its proceedings amount to, impermissible "piecemeal adjudications" of the Tribes' unquantified reserved water rights, *see Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 819, 96 S.Ct. 1236, 1247 (1976).

¶92　In addition, Amici Curiae Affected Landowners inform us that some landowners on the Reservation are non-Indian successors to Indian allottees and that these landowners

---

[9] According to the Public Notice published by the DNRC in November 2000, the Axes' two water rights have priority dates of 1941 and 1913.  However, because there has as yet been no adjudication of water rights on the Reservation, the substance of the Axes' rights is unknown.  *See* Donald D. MacIntyre, *The Adjudication of Montana's Waters—A Blueprint for Improving the Judicial Structure*, 49 Mont. L. Rev. 211, 219 (1988) ("The lack of good records and the existence of exaggerated filings in existing records is indicative of the fact that water rights in Montana prior to 1973 were neither quantified nor prioritized.  These two elements are the essential elements in the bundle of sticks recognized as a water right.  Therefore, no one really knows what 'existing right' is recognized and confirmed [by Article IX, Section 3(1) of the Montana Constitution].  Logically, 'the existing right' can only be whatever right is determined to have existed, both as to quantity and priority, as of July 1, 1973." (footnote omitted)).

allegedly possess rights to a portion of the waters reserved for the Tribes by the Treaty of Hellgate. *See generally Colville Confederated Tribes v. Walton*, 647 F.2d 42, 49-51 (9th Cir. 1981) (discussing the General Allotment Act of 1887, 24 Stat. 388, and the transferability of reserved water rights from Indian allottees to non-Indian purchasers). Affected Landowners also assert that "even if an Indian tribe may have a right to certain water for future needs, if they are not currently using that water it is available for appropriation by non-Indians."

¶93 Thus, the facts of this case implicate (A) state regulatory authority over Indian reserved water rights, (B) state regulatory authority over rights to excess, non-reserved waters, (C) state regulatory authority over Indian reserved water rights that have passed to non-Indian successors, and (D) state regulatory authority over Indian reserved water rights that are not currently in use. For this reason, and for the sake of a comprehensive analysis, it is necessary to clarify the limitations on each.

A

¶94 With respect to the first, state jurisdiction over Indian reserved water rights exists only to the extent authorized by Congress. *See* Mont. Const. art. I ("[A]ll lands owned or held by any Indian or Indian tribes shall remain under the absolute jurisdiction and control of the congress of the United States . . . until revoked by the consent of the United States and the people of Montana."); *Walton*, 647 F.2d at 52 ("[W]ater use on a federal reservation is not subject to state regulation absent explicit federal recognition of state authority." (citing *Federal Power Comm'n v. Oregon*, 349 U.S. 435, 75 S.Ct. 832 (1955)); *Williams v. Lee*, 358 U.S. 217, 218-19, 79 S.Ct. 269, 269-70 (1959); *see also* Blumm, *Reserved Water Rights*, § 37.02, at 37-21 ("Because they are federal rights under the Supremacy Clause of the

54

Constitution, state laws cannot affect Indian reserved rights without federal approval." (footnote omitted)); *Greely*, 219 Mont. at 88, 712 P.2d at 761-62 (noting that Public Law 280, 67 Stat. 588 (1953), "specifically withheld from state courts jurisdiction to adjudicate ownership or right to possession of 'any [Indian] water rights' "); *Arizona v. San Carlos Apache Tribe of Arizona*, 463 U.S. 545, 560 & n.11, 103 S.Ct. 3201, 3210 & n.11 (1983) (same, but also noting that Public Law 280 does not limit the special consent to jurisdiction given by the McCarran Amendment, discussed below).

¶95     In 1952, Congress enacted the McCarran Amendment, 66 Stat. 560, 43 U.S.C. § 666, which provides, in relevant part, as follows:  "Consent is given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights."  43 U.S.C. § 666(a).  The immediate effect of the Amendment was "to give consent to jurisdiction in the state courts concurrent with jurisdiction in the federal courts over controversies involving federal rights to the use of water."  *Colorado River*, 424 U.S. at 809, 96 S.Ct. at 1242.

¶96     Although the McCarran Amendment did not expressly waive the sovereign immunity of Indian tribes, the Supreme Court held in *Colorado River* that the Amendment nevertheless extended state adjudicatory authority to Indian reserved water rights as well as federal reserved water rights.  *Colorado River*, 424 U.S. at 809-13, 96 S.Ct. at 1242-44; *see also Greely*, 219 Mont. at 84, 712 P.2d at 759.  The Court reasoned that, "bearing in mind the ubiquitous nature of Indian water rights in the Southwest, it is clear that a construction of the Amendment excluding those rights from its coverage would enervate the Amendment's objective."  *Colorado River*, 424 U.S. at 811, 96 S.Ct. at 1243.

55

¶97   In *Greely*, we addressed whether, in light of the McCarran Amendment, the State—more specifically, the Water Court of Montana—could exercise jurisdiction over Indian reserved water rights within Montana.  We observed that Article I of the 1972 Montana Constitution declares that all Indian lands in Montana " 'shall remain under the absolute jurisdiction and control of the congress of the United States . . . until revoked by the consent of the United States and the people of Montana.' " *Greely*, 219 Mont. at 85, 712 P.2d at 759 (ellipsis in original) (quoting Mont. Const. art. I).  Consent had been given by the United States in the form of the McCarran Amendment; thus, the question was whether the people of Montana had also given such consent.  *See Greely*, 219 Mont. at 86-87, 712 P.2d at 760.

¶98   We answered this question in the affirmative, reasoning that "the consent of . . . the people of Montana" could be accomplished through legislative enactment and that such an enactment existed—namely, the Water Use Act (Title 85, Chapter 2, MCA).  *See Greely*, 219 Mont. at 87-89, 712 P.2d at 760-62.  Among other things, the Act, which became effective July 1, 1973, provides for the adjudication of water rights (Title 85, Chapter 2, Part 2, MCA), as well as a process for issuing new water use permits (Title 85, Chapter 2, Part 3, MCA) and for authorizing changes in existing water uses (Title 85, Chapter 2, Part 4, MCA).  We concluded that "the legislature's enactment of the Water Use Act constitutes a valid and binding consent of the people of Montana to Congress' grant of state jurisdiction over Indian reserved water rights." *Greely*, 219 Mont. at 88-89, 712 P.2d at 762.

¶99   We then addressed whether the Water Use Act was "adequate" to adjudicate Indian reserved water rights given their "ubiquitous" and "unusual" nature.  In this regard, we made the following observations concerning the Act, as it then stood.  First, we observed that the

56

Act recognized and confirmed water rights that existed prior to July 1, 1973, and that it permitted the Water Court to treat Indian reserved water rights differently from state appropriative rights. *See Greely*, 219 Mont. at 91, 712 P.2d at 763. With respect to the Tribes' hunting and fishing rights, we noted:

> The right to water reserved to preserve tribal hunting and fishing rights is unusual in that it is non-consumptive. A reserved right for hunting and fishing purposes "consists of the right to prevent other appropriators from depleting the stream waters below a protected level in any area where the non-consumptive right applies." *Adair*, 723 F.2d at 1411.

*Greely*, 219 Mont. at 93, 712 P.2d at 764. Because the Act recognized non-consumptive and instream uses of water for fish and wildlife, we concluded that it was "sufficiently broad" to allow adjudication of water reserved to protect tribal hunting and fishing rights, including protection from the depletion of streams below a protected level. *See Greely*, 219 Mont. at 91, 712 P.2d at 763. Furthermore, we noted that the Act recognized that a reserved water right may exist without an actual, present use. *See Greely*, 219 Mont. at 93-94, 712 P.2d at 765. Finally, we observed that the Act permitted the Water Court to apply federal law in determining a proper priority date for each Indian reserved water right and that it permitted tribes to negotiate with the State and agree upon the extent of the reserved water rights of each tribe. *See Greely*, 219 Mont. at 91, 92, 712 P.2d at 763, 764. Given these observations concerning the scope and meaning of the Water Use Act, we concluded that the Act "on its face is adequate to adjudicate Indian reserved water rights." *Greely*, 219 Mont. at 95, 712 P.2d at 766.

¶100   Thus, under *Greely* and the McCarran Amendment—in particular, subsection (1) of the Amendment—the State has jurisdiction to *adjudicate* Indian reserved water rights.

57

*Greely*, 219 Mont. at 84-85, 88-89, 712 P.2d at 759, 762. Such jurisdiction is vested in the Water Court of Montana, not the DNRC. *See* §§ 3-7-101, -501, MCA; *In re Dept. of Nat. Res. & Conservation*, 226 Mont. 221, 228-32, 740 P.2d 1096, 1100-02 (1987); *State ex rel. Jones v. Dist. Court*, 283 Mont. 1, 6-7, 938 P.2d 1312, 1316 (1997).

¶101 Importantly, the McCarran Amendment did not grant the states *regulatory* powers over waters on a federal reservation. *See Walton*, 647 F.2d at 53. Subsection (2) of the Amendment does provide for the "administration" of Indian reserved water rights; however, "administration" in this context refers to the final decree entered in a subsection (1) adjudication. *See South Delta Water Agency v. U.S., Dept. of Interior*, 767 F.2d 531, 541 (9th Cir. 1985); *Orff v. United States*, 358 F.3d 1137, 1143 n.3 (9th Cir. 2004); *Wyoming v. United States*, 933 F.Supp. 1030, 1035-36 (D. Wyo. 1996). In *South Delta*, the Ninth Circuit explained:

> Logically, a court cannot adjudicate the administration of water rights until it determines what those rights are. If plaintiffs' claim were reviewable merely because it relates to the administration of water rights, without plaintiffs first proving the validity of that claim, then the requirement of a general stream adjudication contained in subsection (1) would be superfluous; any party could gain review of agency action by arguing that it is merely seeking a subsection (2) administration, not a subsection (1) determination, of water rights.

*South Delta*, 767 F.2d at 541. Therefore, the court concluded, "Congress intended a waiver of immunity under subsection (2) only after a general stream determination under subsection (1) has been made." *South Delta*, 767 F.2d at 541. In this regard, the court quoted with approval the following definition of "administration" under subsection (2): " 'To administer a decree is to execute it, to enforce its provisions, to resolve conflicts as to its meaning, to construe and to interpret its language.' " *South Delta*, 767 F.2d at 541 (quoting *United States*

58

*v. Hennen*, 300 F.Supp. 256, 263 (D. Nev. 1968)); *cf. In re General Adjudication of All Rights to Use Water in the Big Horn River System*, 753 P.2d 76, 115 (Wyo. 1988) ("The role of the state engineer is . . . not to apply state law, but to enforce the reserved rights as decreed under principles of federal law."), *abrogated on other grounds*, *Vaughn v. State*, 962 P.2d 149, 151 (Wyo. 1998). Because there had been no prior adjudication of relative general stream water rights in the case under review, the Ninth Circuit concluded that "there can be no suit 'for the administration of such rights' within the meaning of the McCarran Amendment." *South Delta*, 767 F.2d at 541 (quoting 43 U.S.C. § 666(a)(2)).

¶102 Likewise, in the case at hand, the Tribes' reserved water rights have not been adjudicated. (As noted already, the Tribes are attempting to quantify their rights through negotiations with the Montana Reserved Water Rights Compact Commission instead.) Thus, because the State's jurisdiction over Indian reserved water rights exists only to the extent authorized by the McCarran Amendment, and because Congress intended a waiver of immunity under subsection (2) of the Amendment only *after* a general stream determination under subsection (1) has been made, the State's jurisdiction over the Tribes' reserved water rights extends, at present, only to the adjudication of those rights in the Water Court— nothing more. Furthermore, any such adjudication must be comprehensive, not piecemeal. *See San Carlos Apache*, 463 U.S. at 569, 103 S.Ct. at 3215; *Colorado River*, 424 U.S. at 819, 96 S.Ct. at 1247; *United States v. District Court In and For Eagle County*, 401 U.S. 520, 525, 91 S.Ct. 998, 1002 (1971); *Dugan v. Rank*, 372 U.S. 609, 618, 83 S.Ct. 999, 1005 (1963).

¶103 For these reasons, the DNRC lacks jurisdiction over the Tribes' reserved water rights.[10]

B

¶104 With respect to state regulatory authority over rights to excess, non-reserved waters on the Reservation, such authority has been confirmed in cases such as *United States v. Anderson*, 736 F.2d 1358 (9th Cir. 1984), though such authority is by no means automatic, *see Colville Confederated Tribes v. Walton*, 647 F.2d 42 (9th Cir. 1981). In *Anderson*, the Ninth Circuit concluded that the State of Washington could exercise its regulatory jurisdiction "over the use of surplus, non-reserved Chamokane Basin waters by nonmembers on non-Indian fee lands within the Spokane Indian Reservation." *Anderson*, 736 F.2d at 1366. In reaching this conclusion, the court reasoned that "the interest of the state in exercising its jurisdiction will not infringe on the tribal right to self-government nor impact on the Tribe's economic welfare because [the Tribe's water] rights have been quantified and will be protected by the federal water master." *Anderson*, 736 F.2d at 1366. Furthermore,

---

[10] Amici Curiae Legislators of the State of Montana contend that "the Legislature has, so far, been prevented from providing for administration of water use on the Flathead Reservation as required by Article IX, section 3(4)." It is not clear, however, that Article IX, Section 3(4), requires—or even authorizes—such administration. Though Article IX, Section 3(4), instructs the Legislature generally to "provide for the administration, control, and regulation of water rights," Article I concomitantly limits state jurisdiction by declaring that "all lands owned or held by any Indian or Indian tribes shall remain under the absolute jurisdiction and control of the congress of the United States . . . until revoked by the consent of the United States and the people of Montana." As just explained, the State's jurisdiction over reserved water rights on the Reservation extends, at present, only to the *adjudication* of those rights (by virtue of subsection (1) of the McCarran Amendment). And with respect to excess, non-reserved waters on the Reservation, regulatory authority may exist, but, as explained below, this question will not be ripe for consideration until it has been determined that such waters exist.

60

the court observed that no direct federal preemption of state regulation had occurred, *Anderson*, 736 F.2d at 1365, and that "the State of Washington's interest in developing a comprehensive water program for the allocation of surplus waters weighs heavily in favor of permitting it to extend its regulatory authority to the excess waters, if any, of the Chamokane Basin," *Anderson*, 736 F.2d at 1366.

¶105 In *Walton*, by contrast, the Ninth Circuit concluded that state regulation of surplus water in the No Name Creek basin was preempted by the creation of the Colville Reservation. *Walton*, 647 F.2d at 52. The court observed that the No Name hydrological system, consisting of an underground aquifer and the creek, is located entirely within the boundaries of the reservation, *Walton*, 647 F.2d at 45, 52, and that the use of these waters "has no impact off the reservation," *Walton*, 647 F.2d at 53. The court further observed that "state regulation of some portion of [the No Name System's] waters would create the jurisdictional confusion Congress has sought to avoid." *Walton*, 647 F.2d at 53. Finally, the court noted that Washington's interest in extending its water law to the reservation "is limited in this case. Tribal or federal control of No Name waters will have no impact on state water rights off the reservation." *Walton*, 647 F.2d at 53.

¶106 A crucial element of the *Anderson* and *Walton* decisions is the fact that the waters the State of Washington sought to regulate were non-reserved waters. Indeed, "[c]entral" to the *Anderson* decision was the fact that the Spokane Tribe's water rights had been quantified. *Anderson*, 736 F.2d at 1366. And in *Walton*, the state was seeking to regulate the portion of No Name Creek that had been found by the lower court to be "surplus" to the Colville Confederated Tribes' requirements. *See Anderson*, 736 F.2d at 1366. As a matter of fact, the

61

United States District Court in the *Walton* case explained at the outset of its memorandum opinion that "the Court must determine *first*, the relative water rights of the Tribe and defendants Walton, and *second*, the relative authority of the Tribe, the United States, and the State of Washington to regulate, allocate and control the subject water." *Colville Confederated Tribes v. Walton*, 460 F.Supp. 1320, 1323 (E.D. Wash. 1978) (emphases added).

¶107 In the case at hand, by contrast, the Tribes' reserved water rights have not been quantified. And because the Tribes are engaged in negotiations with the Reserved Water Rights Compact Commission, no proceeding to adjudicate those rights may occur. *See* § 85-2-217, MCA. Thus, as yet, there are no ascertainable non-reserved/excess/surplus Reservation waters over which the DNRC might exert regulatory power. "Logically, a court cannot adjudicate the administration of water rights until it determines what those rights are." *South Delta*, 767 F.2d at 541. Likewise, the DNRC cannot logically regulate rights to excess, non-reserved Reservation waters until the proper authority (the Water Court or a negotiated compact) determines (1) that such waters actually exist[11] and (2) that those rights—i.e., the rights being subjected to regulation by the DNRC—are in fact to excess,

---

[11] On this point, we posed the following hypothetical to counsel for Amici Curiae Affected Landowners during oral argument: If, in the end, there has been a quantification of the Tribes' reserved water rights premised on the 1855 Treaty of Hellgate and those rights include *all* water on the Reservation, then would junior state-law water rights fall by the wayside? In response, counsel indicated that the hypothetical was highly improbable but that state-law water rights would, in the given scenario, be void.

non-reserved waters and not "empty" rights to tribal reserved waters,[12] *see Anderson*, 736 F.2d at 1365. If there is a "predicate" issue in this case (*see* Opinion, ¶ 14), this is it. Until the foregoing two determinations have been made, the question of whether the DNRC may exercise regulatory authority over excess, non-reserved waters on the Reservation is not ripe. (For this reason, as stated at the outset, the majority's sovereignty discussion—which proceeds from the dubious premise that state-issued permits to Reservation waters are, in actual fact, to *non-reserved* waters—is premature.)

C

¶108 The foregoing analysis mandates the same conclusion with respect to Indian reserved water rights acquired by non-Indian successors to Indian allottees.[13] In *Walton*, the Ninth Circuit concluded that "Indian allottees have a right to use reserved water" and that "an Indian allottee may sell [that] right." *Walton*, 647 F.2d at 50. As for the nature of the right

---

[12] In this regard, the DNRC suggests that it can regulate changes to existing water uses on the Reservation because a person applying for such a change may not appropriate any more water after the change than he or she has appropriated historically and, thus, it does not matter whether surplus waters exist in the source of supply. Yet, if the waters to which the applicant's putative appropriation right applies are, in actual fact, reserved waters, then the DNRC has no regulatory authority over those waters irrespective of the fact that the applicant may not appropriate any more water after the proposed change than he or she has appropriated historically.

[13] For clarification, the cases refer to "non-Indian" successors or purchasers. However, because Indian reserved water rights spring from or are recognized by an agreement between the federal government and a particular tribe, a more precise term might be "nonmember" successors or purchasers (in other words, a person who is not a member of the tribe and who succeeded to a water right reserved for and formerly held by a member of the tribe). *Cf. Zempel v. Liberty*, 2006 MT 220, ¶ 27, 333 Mont. 417, ¶ 27, 143 P.3d 123, ¶ 27 (noting that "Indians may be tribal members or nonmembers" and that, while the United States Supreme Court has referred to "nonmembers" and "non-Indians" interchangeably, the

63

acquired by a non-Indian purchaser, the court observed that whereas the Indian allottee does not lose by nonuse the right to a share of reserved water, the same is not true of a non-Indian purchaser:

> The non-Indian successor acquires a right to water being appropriated by the Indian allottee at the time title passes. The non-Indian also acquires a right, with a date-of-reservation priority date, to water that he or she appropriates with reasonable diligence after the passage of title. If the full measure of the Indian's reserved water right is not acquired by this means and maintained by continued use, it is lost to the non-Indian successor.
> 　　The full quantity of water available to the Indian allottee thus may be conveyed to the non-Indian purchaser. There is no diminution in the right the Indian may convey. We think Congress would have intended, however, that the non-Indian purchaser, under no competitive disability vis-à-vis other water users, may not retain the right to that quantity of water despite non-use.

*Walton*, 647 F.2d at 51.

¶109　The *Walton* court's conclusion that a reserved water right acquired by a non-Indian purchaser is lost if not maintained by continued use—i.e., use it or lose it—implies that such rights are subject to the prior appropriation doctrine. *See In re General Adjudication of All Rights to Use Water in the Big Horn River System*, 48 P.3d 1040, 1047 (Wyo. 2002) ("We suggest Congress . . . likely intended, once transferred to a non-Indian, [the reserved water right] would be subject to the generally applicable prior appropriation laws of the respective state."); *United States v. Hibner*, 27 F.2d 909, 912 (D. Idaho 1928) ("[T]he principle invoked by the courts for the protection of the Indian as long as he retains title to his lands does not prevail and apply to the white man . . . ; otherwise, the application of any other rule would permit such [non-Indian] grantee for an indefinite period to reclaim the balance of his land

relevant distinction is between members and nonmembers of the tribe (citing *Nevada v. Hicks*, 533 U.S. 353, 377 n.2, 121 S.Ct. 2304, 2319 n.2 (2001) (Souter, J., concurring))).

and withhold the application of the water to a beneficial use, which is against the policy recognized in the development of arid lands."). It follows from this that reserved water rights acquired by non-Indian successors may be subject, like non-reserved waters, to state regulatory authority.

¶110  However, as with non-reserved waters, the question of whether the DNRC has jurisdiction over reserved water rights acquired by non-Indian successors is not yet ripe. In *Walton*, the court explained that the non-Indian purchaser "cannot acquire more extensive rights to reserved water than were held by the Indian seller." *Walton*, 647 F.2d at 51. The extent of the Indian seller's right, in turn, is a function of the number of irrigable acres he owns. "If the allottee owns 10% of the irrigable acreage in the watershed, he is entitled to 10% of the water reserved for irrigation (i.e., a 'ratable share'). This follows from the provision for an equal and just distribution of water needed for irrigation." *Walton*, 647 F.2d at 51.

¶111  In the case at hand, the amount of Reservation waters reserved for irrigation purposes is not yet known. Indeed, none of the Tribes' reserved water rights have been quantified. Thus, any reserved water rights held by non-Indian successors also have not been quantified and are, therefore, indeterminate. But even if such unadjudicated rights were accepted at face value (i.e., at the quantity claimed by the holder), there would be no way of knowing whether the holder had overestimated the extent of the right (i.e., had mistakenly incorporated into his or her right reserved waters still belonging to the Tribes). If the holder had, in fact, done so, then the right over which the State would be exercising regulatory authority would include a

65

portion of the Tribes' reserved water rights—something not permitted under the McCarran Amendment, as explained above.

¶112 For these reasons, until such time as the reserved water rights on the Reservation have been quantified, the State lacks regulatory authority over reserved water rights acquired by non-Indian successors to Indian allottees.

D

¶113 Lastly, Amici Curiae Affected Landowners raise an issue concerning unused reserved waters on the Reservation. Specifically, amici assert that "even if an Indian tribe may have a right to certain water for future needs, if they are not currently using that water it is available for appropriation by non-Indians." The only authority cited by amici as support for this allegedly "well-established" proposition is *Walton*, 647 F.2d at 46. On this page of the *Walton* opinion, the Ninth Circuit recites the trial court's finding that there were 237.6 acre feet per year of water to which the Colville Confederated Tribes had a reserved right but which the tribes were not currently using, after which the court notes as follows: "This water is available for appropriation by non-Indians, subject to the Indians' superior right." *Walton*, 647 F.2d at 46.

¶114 Significantly, this observation by the court is not the holding of *Walton*. Furthermore, the observation appears in the context of discussing tribal reserved water rights that, as noted above, had been *quantified*, whereas in the case at hand, we cannot know whether not-currently-used reserved waters exist on the Reservation because we do not yet know the scope of the Tribes' reserved water rights. But most importantly for purposes of the instant discussion of the State's regulatory authority over Reservation waters, appropriation by non-

66

Indians of not-currently-used reserved waters does not change the nature of those waters. In this regard, amici neglect to point out the critical qualifying language set forth in *Walton*: "This water is available for appropriation by non-Indians, *subject to the Indians' superior right*." *Walton*, 647 F.2d at 46 (emphasis added). In other words, any appropriation of not-currently-used reserved waters on the Reservation is subject to the Tribes' superior rights in those reserved waters and, concomitantly, to the McCarran Amendment's jurisdictional restrictions discussed above.

E

¶115   In sum, the State's jurisdiction over Indian reserved water rights exists only to the extent authorized by the McCarran Amendment. Because Congress intended a waiver of immunity under subsection (2) of the Amendment ("administration") only *after* a general stream determination under subsection (1) ("adjudication") has been made, and because a subsection (1) determination has not yet been made with respect to the Tribes' reserved water rights, the State's jurisdiction over those rights extends, at present, only to their adjudication in a comprehensive proceeding in the Water Court.

¶116   Beyond this, the State may regulate the use, by non-Indian fee owners, of *excess, non-reserved* waters and reserved water rights acquired by non-Indian successors to Indian allottees. Such regulation will depend on a proper analysis pursuant to the principles set forth in *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 100 S.Ct. 2578 (1980), and *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245 (1981).[14] However, such analysis is

---

[14] While I have substantial doubts about the majority's interpretations of *Bracker* and *Montana*, I leave an independent analysis of these cases for another day when the issue of

premature until the Tribes' reserved water rights have been quantified. Until that time, any reserved water rights held by non-Indian successors are not cognizable; furthermore, it cannot be known whether excess, non-reserved waters exist on the Reservation and, if so, whether a particular applicant's appropriation right is to such waters (i.e., is not "empty").

¶117 For these reasons, the DNRC lacks jurisdiction over waters within the exterior boundaries of the Reservation and, thus, to approve applications to change existing water uses on the Reservation.[15]

VI

¶118 Given the foregoing conclusion that the DNRC lacks regulatory authority over Reservation waters, an analysis of whether the DNRC can make the no-adverse-effect determination required by § 85-2-402(2)(a), MCA—which is the issue specifically argued in the District Court, ruled on by the District Court, and presented to us on appeal—is, arguably, unnecessary. Nevertheless, because this question has been fully litigated in the case at hand, and because I strongly disagree with the majority's resolution of it, I am proceeding to address the issue.

¶119 As explained earlier, we held in *Ciotti* that the DNRC may not issue new water use permits pursuant to § 85-2-311, MCA, or authorize changes to existing water use permits

---

"the interaction of state regulatory authority and tribal self-government" (Opinion, ¶ 20) is actually before us.

    [15] The same is true, of course, with respect to the DNRC's issuing new water use permits on the Reservation. We have held three times now that the DNRC may not do so for the simple reason that, until such time as the Tribes' reserved water rights have been quantified, the DNRC cannot possibly know whether excess, non-reserved waters are

68

pursuant to § 85-2-402, MCA, on the Reservation until the Tribes' reserved water rights have been quantified by compact negotiation pursuant to § 85-2-702, MCA, or by a general *inter sese* water rights adjudication—the reason being that an applicant's burden to prove lack of unreasonable interference (§ 85-2-311(1)) or adverse effect (§ 85-2-402(2)) cannot be satisfied until that quantification is complete. *Ciotti*, 278 Mont. at 54 n.1, 61, 923 P.2d at 1076 n.1, 1080. Following the 1997 amendments to § 85-2-311 and § 85-2-402, MCA, we held in *Clinch* that the DNRC still may not issue *new* water use permits on the Reservation. *See Clinch*, ¶¶ 27-28; *accord Stults*, ¶¶ 28-29, 36-37. But we did not state whether our decision "applied equally" to *changes* to existing water uses on the Reservation (as we had done in *Ciotti*). In other words, we did not indicate explicitly whether the DNRC, under the amended statutory language, may approve change-of-use applications. We have been squarely presented with this question in the case at hand. For the reasons which follow, an applicant to change an existing water use on the Reservation—no less than an applicant for a new water use permit on the Reservation—cannot prove that the proposed change will not "adversely affect" the Tribes' reserved water rights until those rights have been quantified. Accordingly, the DNRC, as a matter of law, cannot approve such applications.

## A

¶120 At the time we decided *Ciotti*, § 85-2-311(1), MCA (1995), provided, in relevant part, as follows:

> [T]he department shall issue a permit if the applicant proves by a

available for appropriation by a new user. *See Ciotti*, 278 Mont. at 60, 61, 923 P.2d at 1079, 1080; *Clinch*, ¶¶ 27-28; *Stults*, ¶¶ 28-29.

preponderance of evidence that the following criteria are met:

> (a) there are unappropriated waters in the source of supply at the proposed point of diversion:
> (i) at times when the water can be put to the use proposed by the applicant;
> (ii) in the amount that the applicant seeks to appropriate; and
> (iii) during the period in which the applicant seeks to appropriate, in the amount requested and that is reasonably available;
> (b) the water rights of a prior appropriator will not be adversely affected;
> . . .
> (e) the proposed use will not interfere unreasonably with other planned uses or developments for which a permit has been issued or for which water has been reserved;
> . . . .

Similarly, § 85-2-402(2), MCA (1995), provided, in relevant part, as follows:

> [T]he department shall approve a change in appropriation right if the appropriator proves by a preponderance of evidence that the following criteria are met:
> (a) The proposed use will not adversely affect the water rights of other persons or other planned uses or developments for which a permit has been issued or for which water has been reserved.

Given that both of these provisions required the applicant to prove that the water rights of prior appropriators (§ 85-2-311(1)(b)) or other persons (§ 85-2-402(2)(a)) will not be adversely affected by the proposed use, it is not surprising that we observed in *Ciotti* that "an applicant's burden of proof is essentially the same under either statute," *Ciotti*, 278 Mont. at 54 n.1, 923 P.2d at 1076 n.1.

¶121 As noted above, the Legislature amended the language of § 85-2-311 and § 85-2-402 in 1997. In both the District Court and this Court, the DNRC has repeatedly emphasized the Legislature's stated intent to "negate[]" our *Ciotti* decision with the amendments. *See* Laws of Montana 1997, Ch. 497, Statement of Intent, at 2790 ("The legislature intends that the

70

Montana Supreme Court's decision in [*Ciotti*] be negated by the passage and approval of this bill."). Of course, a statement of intent cannot by itself accomplish any particular result; rather, the pertinent statutory language must be amended accordingly. Thus, while the Legislature's Statement of Intent is relevant to our analysis, the amended language of § 85-2-311 and § 85-2-402 is ultimately dispositive.

¶122 With respect to § 85-2-311, the Legislature inserted the following three sentences in subsection (1):

> A permit may be issued under this part prior to the adjudication of existing water rights in a source of supply. In a permit proceeding under this part there is no presumption that an applicant for a permit cannot meet the statutory criteria of this section prior to the adjudication of existing water rights pursuant to this chapter. In making a determination under this section, the department may not alter the terms and conditions of an existing water right or an issued certificate, permit, or state water reservation.

Section 85-2-311(1), MCA (1997). The Legislature also revised subsection (1)(a) to require the applicant to prove (i) that "there is water physically available at the proposed point of diversion in the amount that the applicant seeks to appropriate" and (ii) that "water can reasonably be considered legally available during the period in which the applicant seeks to appropriate, in the amount requested, based on the records of the department and other evidence provided to the department." Section 85-2-311(1)(a)(i)-(ii), MCA (1997). Significantly, the Legislature eliminated the requirement in subsection (1)(e) that the applicant prove that the proposed use will not "interfere unreasonably" with the uses for which water has been "reserved." At the same time, however, the Legislature retained the requirement in subsection (1)(b) that the applicant prove that the water rights of a prior appropriator under an "existing water right" will not be "adversely affected." Section 85-2-

71

311(1)(b), MCA (1997). Furthermore, § 85-2-102, MCA (1997) was amended to define "existing water right" as including "Indian reserved water rights created under federal law."

¶123 In *Clinch*, the Tribes argued that the Legislature's effort to allow the issuance of permits in disregard of the Tribes' pervasive and unquantified reserved water rights violated Article IX, Section 3(1) of the 1972 Montana Constitution, which "recognize[s] and confirm[s]" all water rights existing as of July 1, 1973. *See Clinch*, ¶ 18; Mont. Const. art. IX, § 3(1). Analyzing this contention and the effects of the 1997 amendments, we reasoned as follows:

> It is clear from the statement of intent to which we previously referred that the legislature intended by S.B. 97 to allow the Department to issue water use permits prior to the quantification of the Tribes' reserved water rights which we held that it could not do in *Ciotti*. However, it is also clear that to issue water use permits on the Flathead Reservation prior to the quantification of the Tribes pervasive reserved right requires use of water which may belong to the Tribe and would, therefore, violate Article IX, Section 3(1) of the Montana Constitution which protects existing water rights whether adjudicated or unadjudicated and which the State concedes includes those rights reserved by federal law to Indian tribes.

*Clinch*, ¶ 27. We therefore interpreted "legally available" under § 85-2-311(1)(a)(ii) to mean that "there is water available which, among other things, has not been federally reserved for Indian tribes." *Clinch*, ¶ 28. Given this interpretation, we held that in spite of the amendments to § 85-2-311, the DNRC still

> cannot determine whether water is legally available on the Flathead Indian Reservation, because the Department cannot determine whether the issuance of those permits would affect existing water rights until the Tribe's rights are quantified by compact negotiation pursuant to § 85-2-702, MCA, or by a general inter sese water rights adjudication.

*Clinch*, ¶ 28. Accordingly, we ordered that the DNRC not issue further new water use

72

permits on the Reservation until the Tribes' water rights have been quantified. *Clinch*, ¶ 28;

*see also Stults*, ¶¶ 28-29; 36-37.

¶124   Turning now to § 85-2-402, the Legislature, in amending this provision, inserted the

following two sentences in subsection (1):

> The right to make a change subject to the provisions of this section in
> an existing water right, a permit, or a state water reservation is recognized and
> confirmed.  In a change proceeding under this section, there is no presumption
> that an applicant for a change in appropriation right cannot establish lack of
> adverse effect prior to the adjudication of other rights in the source of supply
> pursuant to this chapter.

Section 85-2-402(1), MCA (1997).  The Legislature also made the following revisions to

subsection (2)(a), which are indicated below with strikethrough (old language) and italics

(new language):

> [T]he department shall approve a change in appropriation right if the
> appropriator proves by a preponderance of evidence that the following criteria
> are met:
>          (a) The proposed ~~use~~ *change in appropriation right* will not adversely
> affect the *use of the existing* water rights of other persons or other *perfected or*
> planned uses or developments for which a permit *or certificate* has been issued
> or for which ~~water has been reserved~~ *a state water reservation has been issued*
> *under part 3*.

Section 85-2-402(2)(a), MCA (1997) (strikethrough and italics added).  (Recall that § 85-2-

102 was amended to define "existing water right" as including "Indian reserved water rights

created under federal law.")  This statutory language has remained unchanged through the

present.

¶125   In comparing the amended version of § 85-2-311 with the amended version of § 85-2-

402, it is noteworthy that both provisions reject any presumption that an applicant for a new

water use permit or a change in existing use cannot meet the pertinent statutory criteria prior

to the adjudication of existing water rights in the source of supply. *See* §§ 85-2-311(1), -402(1), MCA. Indeed, the DNRC makes much of this new language. However, the new "no presumption" language did not lead to a different result in *Clinch*. In fact, we held under the amended version of § 85-2-311(1) that the DNRC still cannot determine whether the issuance of a new water use permit will affect the Tribes' existing water rights until those rights have been quantified. *Clinch*, ¶ 28. In other words, the absence of a presumption that the applicant cannot meet the pertinent statutory criteria did not somehow enable the DNRC to do what it could not do under *Ciotti*—namely, determine whether the issuance of a new water use permit will adversely affect the Tribes' reserved water rights. And the same is equally true of change-of-use applications. Just because in a change-of-use proceeding there is no presumption that the applicant "cannot establish lack of adverse effect prior to the adjudication of other rights in the source of supply," it does not follow that the applicant necessarily *can* establish lack of adverse effect. The burden to do so (i.e., to establish lack of adverse effect) by a preponderance of evidence still remains—presumption or no presumption—and the dispositive question, therefore, is whether it is possible, in *any* case, for an applicant to make that showing before the Tribes' reserved water rights have been quantified.

¶126 The crux of the DNRC's position that it is now authorized to approve change-of-use applications—indeed, the centerpiece of the DNRC's arguments in the District Court and in this Court—is its contention that the Legislature not only intended to "negate" *Ciotti*, but in fact did so by virtue of the 1997 amendments to § 85-2-402. Though asserting that "*Ciotti* is dead law" (emphasis omitted), the DNRC acknowledges, as it must, that we resurrected our

74

*Ciotti* holding—at least with respect to the issuance of new water use permits—in *Clinch*. Necessarily, then, the DNRC acknowledges that the 1997 amendments to § 85-2-311 did not "negate" the quantification prerequisite in new-use proceedings (in other words, did not "negate" the fact that in order to prove that the Tribes' reserved water rights will not be "adversely affected" by a proposed new use, those rights must first be quantified). The DNRC's position, therefore, is that the amendments to § 85-2-402 somehow accomplished what the amendments to § 85-2-311 did not—namely, negating the quantification prerequisite in change-of-use proceedings.

¶127 However, the DNRC has proffered no persuasive explanation for why the language of former § 85-2-402(2)(a)—requiring the applicant to prove that "[t]he proposed use will not adversely affect the water rights of other persons"—is materially distinguishable from the language of amended § 85-2-402(2)(a)—requiring the applicant to prove that "[t]he proposed change in appropriation right will not adversely affect the use of the existing water rights of other persons"—probably because there is no material distinction between the two. Rather, it seems that what the DNRC is inviting us to do here is simply to revisit the issue we addressed in *Ciotti* and analyze it under materially indistinguishable statutory language, but reach the opposite conclusion we did in *Ciotti*.[16]

---

[16] The DNRC is nothing if not persistent. The record reflects that the DNRC has been engaged in water use permitting and approving changes to water uses on the Reservation since 1973, when the Water Use Act became effective. Mr. Stults testified in the District Court that he did not know how many new permits have been issued and how many changes of use have been approved by the DNRC during this period, but he did state that "[i]t's tens of thousands." Notably, the DNRC has done so over both the pro forma threshold jurisdictional objections routinely filed by the Tribes and a 1987 decision of the Montana First Judicial District Court, which concluded that the DNRC could not issue permits under

75

¶128 Notwithstanding the doctrine of stare decisis, the majority has accepted the DNRC's invitation. While I can agree that stare decisis is not absolute and that it sometimes is necessary for this Court to revisit one of its precedents, when we do so we must explain not only why we are reconsidering the previous holding but also, if we overrule it, why that holding was erroneous. The lack of any analysis in the Court's Opinion today explaining why the language of former § 85-2-402(2)(a) is materially distinguishable from the language of amended § 85-2-402(2)(a) suggests that today's majority simply disagrees with the decision this Court reached in *Ciotti* and is taking this opportunity to implement a different result. In other words, "[p]ower, not reason, is the new currency of this Court's decisionmaking." *Payne v. Tennessee*, 501 U.S. 808, 844, 111 S.Ct. 2597, 2619 (1991) (Marshall, J., dissenting).

¶129 I submit that a mere change in the personnel of this Court is not a valid basis for overruling one of our prior holdings. There is no reason to conclude differently than we did in *Ciotti* and *Clinch* that, as a matter of law, lack of adverse effect *cannot* be proven *until* the

§ 85-2-311 until the existing water rights in the source of supply are quantified, *see Ciotti*, 278 Mont. at 61-64, 923 P.2d at 1080-82 (Nelson, J., specially concurring) (noting that the DNRC was litigating in *Ciotti* an issue the DNRC had already litigated, unsuccessfully, under materially indistinguishable statutory language in *United States v. Mont. Dept. of Nat. Resources and Conserv.*, No. 50612 (Mont. 1st Jud. Dist. June 15, 1987)). Although the Tribes finally prevailed on the particular objections that culminated in our *Ciotti* decision, they have been forced to relitigate the issues decided in *Ciotti* by virtue of the statutory amendments discussed above and the DNRC's concomitant resumption of activities on the Reservation. Then, following our reaffirmation of *Ciotti* in *Clinch*, the Tribes again found themselves having to defend this Court's decision. *See Stults*, ¶¶ 8, 25 (recounting the DNRC's effort in 2001 to get this Court to "dissolve or modify" our holding in *Clinch* and the DNRC's decision to grant the application at issue in *Stults* despite "the seemingly clear mandate of *Ciotti* and *Clinch*"). Now, again, the DNRC is asking this Court to revisit a holding that it simply does not like.

Tribes' reserved water rights have been quantified. For these reasons, the DNRC's arguments based on the 1997 amendments to § 85-2-402 are unavailing.

B

¶130   Notwithstanding the absence of a material difference between the version of § 85-2-402 at issue in *Ciotti* and the version of § 85-2-402 now under review, it is still necessary to address a critical point made by the DNRC in the District Court. Specifically, the DNRC explained that when it considers adverse effect in a change-of-use proceeding, it bases its analysis on factors that are distinguishable from the factors it relies on when considering adverse effect in a new-use proceeding. Essentially, the DNRC contends that irrespective of the amendments to § 85-2-311 and § 85-2-402, the DNRC applies the adverse effect test differently in change-of-use proceedings versus new-use proceedings. In the DNRC's view, the factors it uses in its change-of-use analysis enable it to determine whether the proposed change will adversely affect the Tribes' reserved water rights; thus, the DNRC asserts, it is able to satisfy the criteria set forth in § 85-2-402 and we should reach a different result in this case than we did in *Clinch*. The District Court rejected this argument in granting the Tribes' motion for summary judgment, and I conclude that the court properly did so.

¶131   At the hearing on the Tribes' motion for a preliminary injunction, Mr. Stults testified on direct examination that the major criterion in both a new-use proceeding and a change-of-use proceeding is "lack of adverse effect [on existing water rights]." However, he further explained that with respect to a new use, "[y]ou're looking at whether a new diversion, additional water being taken out of the source, will somehow make it -- an existing water user unable to reasonably fulfill their water right." By contrast,

77

with a change application you're looking at the -- you have an existing water right that has been put to use and it's been used and has a pattern of use over a period of time. And so you're looking at whether changing it is going to somehow increase it so that it -- you have an increased consumption or increased burden on the source. You're really looking to make sure that historically X has been taken out of the stream and X went back into the stream, and to make sure if the change were to take place X would still come out of the stream and X would still go back. You could get X plus one going back. You can't have X minus one. You're just looking to make sure that -- I guess if you had a piece of property, somebody wanted to make a change on the piece of property, they can change it internally so long as they don't make the property bigger and end up taking somebody else's property. So as long as you can tell that it's just exactly the same size, that is -- that is the test you're looking for.[17]

¶132 Thus, in a new-use proceeding the DNRC determines whether there is any water available in the source of supply for the proposed new use, which can only occur after the existing water rights in the source of supply have been quantified. The DNRC then considers whether the proposed new diversion will impinge upon the existing water rights. In a change proceeding, however, the DNRC looks only at the applicant's "pattern of use over a period of time" and does not consider the scope of the objectors' rights in the source of supply. This approach is based on the premise that so long as the proposed change does not amount to a change in the quantity of water being diverted from and returned to the source, it will not

_____

[17] As noted above, neither the Tribes' reserved water rights nor the putative state-law appropriation rights to non-reserved waters on the Reservation have been adjudicated or otherwise quantified. *See* ¶ 90 n.9, *supra*. Thus, the assumption underlying the DNRC's entire argument—namely, that "with a change application . . . you have an existing water right"—is doubtful, if not unfounded. (The same is true of the DNRC's assumption that the exercise of a state-law appropriation right on the Reservation is not *already* infringing the Tribes' reserved water rights.) However, for the sake of evaluating the DNRC's change-of-use analytical framework as applied on the Reservation, the ensuing discussion proceeds under the premise that the change applicant's claimed water right is an otherwise valid right to non-reserved waters.

adversely affect the objectors' rights. "What we're look [sic] at is whether the change that is being proposed would in some way alter the [applicant's] right so that it was somehow larger than what it had been before. If its consumptive use increases, it creates more of a burden on the source." But, "if it's unaltered in its burden on the source, it does not -- it can't have any different impact than it's had historically."

¶133 The inherent inadequacy of this "full bucket" approach is immediately obvious from the DNRC's property analogy. One need only open a local newspaper to realize that a property owner may change his or her internal use of a particular piece of property, without making the property bigger, and still adversely affect his or her neighbors' uses of their properties. For instance, in Jerome, Idaho, the National Park Service expressed concern about the effects of a feedlot proposed to be built 1½ miles upwind of the Minidoka Internment National Monument. Of specific concern are impacts on air quality, increases in pests (insects) and dust, possible effects on water, and issues of waste management and traffic. *See Proposed Feedlot Next to Monument Stirs Opposition*, Helena Independent Record 7A (Dec. 8, 2006). Under the DNRC's interpretation of § 85-2-402(2)(a), however, the uses of neighboring properties are not "adversely affect[ed]" as long as the property at issue is "exactly the same size" as before the change.

¶134 This interpretation obviously does not bear close scrutiny. As a matter of fact, the DNRC's analogy actually illustrates the analytical flaw in focusing solely on "whether a change would increase the burden on the source." As the District Court astutely pointed out, an adverse effect may occur even though the applicant's burden on the source of supply has not changed. "[C]ouldn't the change in use affect somebody's groundwater, dry up a swamp

79

or create a swamp where one wasn't before?" Indeed, § 85-2-401, MCA, speaks of a number of different "condition[s] of water occurrence, such as the increase or decrease of streamflow or the lowering of a water table, artesian pressure, or water level," that could be adversely affected by a proposed change of use.

¶135 With respect to this point, Mr. Stults conceded on cross-examination that a change in point of diversion, for instance, could adversely affect an existing water right without an increase in the burden on the source. Specifically, he agreed that if a right exists to a particular in-stream flow in between the diversion points that the applicant wishes to change from and to, the applicant will affect that right by changing the point of diversion. In other words, if a stream flows from point A, to point B, to point C, etc., all the way to point Z, and the applicant wishes to change his point of diversion from point Q to point J, the flow of the stream between points J and Q will be affected—possibly adversely—even though the applicant has not changed the quantity of water he is diverting from the stream. *See*, *e.g.*, *Thompson v. Harvey*, 164 Mont. 133, 519 P.2d 963 (1974). If the Tribes have a reserved right to a particular flow in that stream between points J and Q, their right will be infringed by the change—something the DNRC cannot possibly determine until the Tribes' reserved water rights have been quantified.

¶136 A change in place of use, purpose of use, or place of storage could have similar consequences. While the point of diversion in such situations may be the same, the point of return or the route of return may not be, ultimately creating the scenario just discussed. Indeed, the dynamics of an ecosystem may be impacted by a mere change in the place of use, purpose of use, or place of storage of water on the applicant's property—an essential variable

80

in assessing a change-of-use application that the DNRC ignores, presuming instead that if the applicant will not be drawing more water out of the source than he or she did before the proposed change, then the change will not adversely affect anyone else's existing water rights.

¶137   The DNRC assures us that "a change applicant can go out and evaluate how everyone is actually exercising their water rights." This assurance, however, only further illustrates the inadequacy of the DNRC's approach: it ignores the reality that Indian reserved water rights may exist without a present or actual use. *Greely*, 219 Mont. at 90, 712 P.2d at 762. It is not possible for an applicant to go out and evaluate how the Tribes' are "actually exercising" water rights that have not yet been defined or put to use.

¶138   Likewise, it is necessary to keep in mind that some of the Tribes' reserved water rights are non-consumptive. They may include the right to a particular flow in a particular stream at a particular point. *See Joint Bd. of Control of Flathead, Mission and Jocko Irr. Districts v. United States*, 832 F.2d 1127, 1131-32 (9th Cir. 1987). The 1855 Treaty of Hellgate secured the Tribes' aboriginal fishing, hunting, gathering, and pasturing rights (*see* ¶ 89 n.8, *supra*), which in turn may require a particular quantity of water being located (or *not* being located) at a particular location. We recognized this point with respect to stream waters in *Greely*, where we stated:

> The right to water reserved to preserve tribal hunting and fishing rights is unusual in that it is non-consumptive. A reserved right for hunting and fishing purposes "consists of the right to prevent other appropriators from depleting the stream waters below a protected level in any area where the non-consumptive right applies." *Adair*, 723 F.2d at 1411.

*Greely*, 219 Mont. at 93, 712 P.2d at 764. Furthermore, we noted:

81

The Supreme Court has also held that under the implied-reservation-of-water-rights doctrine, Indians are entitled to sufficient water "to develop, preserve, produce or sustain food and other resources of the reservation, to make it livable." *Arizona v. California*, 373 U.S. at 599-600, 83 S.Ct. at 1497 [decree entered, 376 U.S. 340, 84 S.Ct. 755, 11 L.Ed.2d 757 (1964)]. "[I]ndian treaty rights to a natural resource that once was thoroughly and exclusively exploited by the Indians secures so much as, but no more than, is necessary to provide the Indians with a livelihood—that is to say, a moderate living." *Washington v. Fishing Vessel Ass'n*, [443 U.S. 658, 686, 99 S.Ct. 3055, 3075 (1979)].

*Greely*, 219 Mont. at 93, 712 P.2d at 764-65 (first two alterations in original).

¶139  Because these water rights are ubiquitous and elusive, and likely pervasive on the Reservation, *see Greely*, 219 Mont. at 84, 712 P.2d at 759 (quoting *Colorado River*, 424 U.S. at 811, 96 S.Ct. at 1243); *Ciotti*, 278 Mont. at 59, 60, 923 P.2d at 1079, the DNRC's focus in a change-of-use proceeding exclusively on whether the applicant will enlarge his or her existing appropriation by the proposed change—i.e., whether the quantity taken out after the proposed change will be greater than before the change—with no consideration for the impact that the change of use might have on the surrounding ecosystem or on the Tribes' future uses of water, is wholly inadequate for making a no-adverse-effect determination vis-à-vis the Tribes' unquantified reserved water rights.

¶140  With respect to the Axes' proposed change, for instance, it defies common sense to conclude that so long as the Axes are not diverting any more water than they diverted historically, their change in use from irrigation of pasture and hay fields to an 11.75-surface-acre manmade water-ski pond cannot adversely affect the use of water rights reserved for aboriginal hunting and fishing. Again, this is not rocket science. *See Stults*, ¶ 61 (Nelson, J., specially concurring). Once one understands and accepts that "[a] water system is a unitary

82

resource" and that "[t]he actions of one user have an immediate and direct effect on other users," *Walton*, 647 F.2d at 52, one should recognize that a determination of no adverse effect on the Tribes' reserved water rights cannot be made until those rights have been quantified.

¶141   Notably, the DNRC has previously stated that " '[m]istaken nonrecognition of an objector's right, and grant of a change authorization based thereon, could irreparably damage objector.' " *Matter of the Application for Change of Appropriation Water Rights Nos. 101960-41S and 101967-41S by Royston*, 249 Mont. 425, 430, 816 P.2d 1054, 1058 (1991) (quoting from the record in the underlying administrative proceeding).  Such reasoning is consistent with the fact that the burden in change-of-use proceedings is not on the objector to prove adverse effect but, rather, on the applicant to prove lack thereof.  Section 85-2-402(2), MCA; *Royston*, 249 Mont. at 428, 816 P.2d at 1057.[18]  Unfortunately, the DNRC has since adopted the contrary view that any "speculation" as to adverse effect should be resolved in favor of the applicant.  Yet, nothing in the statutory scheme has changed; the burden in change-of-use proceedings is still on the applicant to prove lack of adverse effect, and the DNRC so to find.  The DNRC cannot do so with respect to waters on the Reservation as long

_____

[18] In this regard, it is curious that the DNRC submitted an interrogatory to the Tribes in the District Court asking them to "[d]escribe the nature, scope and extent of the claimed water rights that will be injured and the nature of the injury that will result . . . from a granting of a change of use authorization to Axe."  The DNRC evidently has missed the point the Tribes have been making for the past twenty years, which is that "the nature, scope and extent" of their reserved water rights is not presently known and will not be known until the quantification process is complete, and thus the nature of the injury, if any, that will result from the granting of a change-of-use authorization to Axe is not yet ascertainable.

as the possibility exists that a change of use will adversely affect the Tribes' unquantified reserved water rights.

¶142   Nevertheless, the DNRC posits: "*Might* any change of a water right result in different stream conditions that adversely affect another water right?  Certainly. . . .  Does every proposed change automatically result in adverse effect to other water rights? Certainly not." Thus, the DNRC argues, change-of-use applicants should not be precluded from trying to prove lack of adverse effect "[j]ust because the Tribes or the district court feel there *might*, *may*, or *could* be cases where adverse effect *might* occur."  Agreeing with the DNRC, the majority decides that change-of-use applicants should have the opportunity to prove lack of adverse effect.  Opinion, ¶¶ 38, 40.

¶143   However, the majority and the DNRC presume, mistakenly, that the effects a proposed change might, may, or could have on the Tribe's reserved water rights can actually be identified and measured *before* those rights have been quantified.  Again, the testimony elicited at the hearing in the District Court establishes that this premise is incorrect.  While an applicant might be able to prove that "no more water will be diverted than is currently," Opinion, ¶ 38, he or she cannot prove, until the scope of the Tribes' reserved water rights has been determined, that the proposed change will not adversely affect those rights in some other way (e.g., by increasing or decreasing the flow in a protected stretch of a stream, by raising or lowering a water table, artesian pressure, or water level in a protected area, or by impeding aboriginal practices).  Thus, the majority has provided change-of-use applicants with the opportunity to prove something that, as a matter of law, cannot as yet be proven.  In the mean time, the Tribes will be in the position of having to contest change-of-use

applications, as a matter of course, in potentially thousands of separate cases. *See* ¶ 57, *supra*.

¶144 On a related point, Amici Curiae Affected Landowners contend that "the Tribes request [this] Court to conclusively presume that *every* change of use by *every* water right holder on the Reservation will *always* adversely affect their rights." Amici are also of the view that we adopted such a "conclusive presumption" in *Ciotti*. Amici are mistaken on both counts. As the foregoing analysis makes clear, there is no basis for "conclusively presuming" either adverse effect or lack thereof. Rather, until the Tribes' reserved water rights have been quantified, adverse effect simply cannot be determined; in other words, it is not possible at this time for an applicant to make the requisite showing, which was the basis of our holding in *Ciotti* and is the point of the discussion here.

¶145 Before concluding, it is appropriate to address a concern raised by the DNRC and echoed by Amici Curiae Legislators of the State of Montana. Citing the interest in "economic development," the DNRC argues that it must be permitted to approve changes to existing water uses throughout the State during the pendency of water right adjudications. In a similar vein, Legislators opine that if the DNRC cannot approve changes to existing water uses on the Reservation until the Tribes' reserved water rights have been quantified, then "the existence of any water right in an unadjudicated basin would prevent the State from doing any administration of water rights and water use prior to adjudication." In other words, there appears to be a perception that a holding in this case consistent with our decisions in *Ciotti*, *Clinch*, and *Stults* would result in a statewide shutdown of water use regulation. (A similar view was noted in the dissenting opinions in each of those cases.)

85

¶146   Whether or not the principles enunciated in *Ciotti*, *Clinch*, and *Stults* may be extended to cases not involving Indian reserved water rights (and I express no opinion in that regard, given that we do not have such facts before us in the case at hand), the reasoning of the DNRC and amici is flawed to the extent that it equates Indian reserved water rights with state appropriative water rights.  As explained above, there are crucial distinctions between the two.  *See* Part IV, *supra*.  And, as is clear from a careful reading of *Ciotti*, *Clinch*, and *Stults*—all three of which quote the portion of *Greely* in which we discussed the differences between state appropriative water rights and Indian reserved water rights—the unique nature of Indian reserved water rights informed our decisions in those cases, as it informs my analysis herein.

C

¶147   In sum, there is not a material difference between the version of § 85-2-402 at issue in *Ciotti* and the version of § 85-2-402 now under review.  Thus, there is no reason to hold differently here than we did in *Ciotti*—and as we held in *Clinch*, with respect to the issuance of new water use permits—that the DNRC may not approve changes in existing water uses pursuant to § 85-2-402, MCA, on the Reservation until the Tribes' reserved water rights have been quantified by compact negotiation pursuant to § 85-2-702, MCA, or by a general *inter sese* water rights adjudication.

¶148   But even when the DNRC's analytical approach for evaluating change-of-use applications is considered as a matter of first impression (i.e., independently of our holding in *Ciotti*), it is clear that this approach rests on an invalid premise—specifically, that so long as the proposed change does not amount to an increase in the quantity of water being diverted

86

from and returned to the source, it will not adversely affect the Tribe's reserved water rights.

For the reasons set forth above, a change in water use could indeed result in an increase or decrease of a protected streamflow, the raising or lowering of a water table, artesian pressure, or water level in a protected location, or some other impact on the ecosystem—though the quantity of water that is being diverted from the source is still the same. And whether such a result would infringe the Tribes' reserved water rights cannot be determined until the scope of those rights is known. The DNRC cannot avoid the no-adverse-effect criterion in § 85-2-402(2)(a) by the mere expedient of excluding relevant variables from its change-of-use equation.

## VII

¶149   In conclusion, the DNRC lacks jurisdiction over waters within the exterior boundaries of the Reservation. State administrative power is not authorized with respect to Indian reserved water rights until those rights have been adjudicated (or quantified by compact negotiation). And while regulatory power may exist with respect to excess, non-reserved waters, it is not presently possible to know whether such waters even exist on the Reservation and whether a particular putative state-law water right is to such non-reserved waters since the Tribes' reserved water rights have not yet been quantified.

¶150   Likewise, the DNRC, as a matter of law, cannot determine whether a proposed change to an existing water use on the Reservation will "adversely affect" the Tribes' reserved water rights until those rights have been quantified. It is entirely conceivable that a proposed change, though the applicant will not be drawing any more water from the source of supply than he or she has drawn historically, will nevertheless affect stream conditions, a water

87

table, or other aspects of the surrounding ecosystem in such a way that the Tribes' non-consumptive water rights reserved to preserve the Tribes' aboriginal fishing, hunting, and gathering practices are adversely affected. Until those rights have been quantified, it simply is not possible to make this determination.

¶151   In reaching a different result, the majority today revises § 85-2-402(2)(a), MCA, such that it now requires a determination only that "no more water will be diverted than is currently." Opinion, ¶ 38. In so doing, the majority emasculates the statute's "adversely affect" prohibition and exposes the Tribes' reserved water rights to routine and piecemeal infringement by the DNRC.

¶152   Lastly, as I stated at the outset, there are no genuine issues as to any material facts needing resolution in the District Court. The factual issues identified by the majority are not yet ripe. The only factual matter implicated by the Tribes' complaint in this case is how the DNRC determines lack of adverse effect in a change-of-use proceeding. The District Court took evidence on this question, and no genuine issues remain as to it. All other questions raised herein are legal questions; and, for the reasons discussed above, the Tribes are entitled to judgment as a matter of law on both the "adversely affect" question and the jurisdictional question. M. R. Civ. P. 56(c).

¶153   Unfortunately, as a result of the majority's proceeding in disregard of the factual circumstances that presently exist on the Reservation, the District Court is being instructed by this Court to do something that (a) is impossible and (b) will yield no practical or binding result. For one thing, the District Court is, on remand, to analyze issues of tribal sovereignty in a complete factual vacuum. Without knowing the quantity of reserved waters and non-

reserved waters (if any) on the Reservation, the court cannot possibly make the determinations requested by the majority in ¶¶ 29-32 of today's Opinion. Furthermore, any ruling rendered by the District Court respecting state regulatory authority over excess, non-reserved waters on the Reservation will be meaningless at this juncture, given that we do not know whether such waters even exist. Ultimately, therefore, the majority is placing the District Court in a Catch-22, while simultaneously encouraging the DNRC to pursue regulatory authority that it plainly does not have. "Having lost sight of our obligation to drain the swamp, we have, worse, thrown the trial court into the water with instructions to subdue the alligators." *Montana Power Co. v. Burlington Northern R. Co.*, 272 Mont. 224, 245, 900 P.2d 888, 901 (1995) (Nelson, J., dissenting).

¶154 In closing, two facets of this case deserve mention. First, the arguments presented to this Court by the DNRC and several of the amici convey a general sense of frustration with the open-ended nature of the Tribes' reserved water rights and the "regulatory vacuum" that they claim exists on the Reservation at present. Amici Curiae Affected Landowners, in particular, complain that they are being treated "unfairly." Without intending to minimize any of these frustrations, I find the Ninth Circuit's comments on this issue to be both instructive and compelling:

> We recognize that open-ended water rights are a growing source of conflict and uncertainty in the West. Until their extent is determined, state-created water rights cannot be relied on by property owners.
> Resolution of the problem is found in quantifying reserved water rights, not in limiting their use.

*Walton*, 647 F.2d at 48 (citations omitted). Indeed, the Tribes' reserved water rights spring from or are recognized by the July 16, 1855 Treaty of Hellgate. That treaty was "not a grant

89

of rights to the [Tribes], but a grant of rights from them—a reservation of those not granted." *United States v. Winans*, 198 U.S. 371, 381, 25 S.Ct. 662, 664 (1905). The rights exist; and they may not be ignored for the sake of convenience or economic expansion. Rather, the competing interests expressed by the parties and amici will best be served by seeing the quantification process through.

¶155 Second, I note that this case and the years of litigation leading up to it call into question one of the presumptions on which our decision in *Greely* rested. With respect to "the fear on the part of various parties that the subjection of Indian water rights to state court jurisdiction will of necessity hurt the Indian people," *Greely*, 219 Mont. at 95, 712 P.2d at 766, we observed that " 'Indian interests may be satisfactorily protected under regimes of state law,' " *Greely*, 219 Mont. at 95, 712 P.2d at 766 (quoting *San Carlos Apache*, 463 U.S. at 551, 103 S.Ct. at 3206, in turn quoting *Colorado River*, 424 U.S. at 812, 96 S.Ct. at 1243). Unfortunately, to the extent Montana's Water Use Act was designed as such a regime—i.e., a regime which satisfactorily protects Indian interests—its regulatory provisions are not being applied as such, which the twenty years following our *Greely* decision bear out and the facts of the case at hand further confirm.

¶156 In this regard, it is illuminating that the DNRC perceives itself as a state agency "entrusted" with "defending . . . the constitutional rights of water right holders." Indeed, in the case at hand, the DNRC has actually taken on the role of advocate for the interests of putative state-law water right holders on the Reservation. *See* Opinion ¶ 9; ¶ 65 n.4, *supra*. As the DNRC explains in its Opening Brief, "[t]he DNRC appealed this case because of the

magnitude of what is at stake to existing water right holders on fee land within the Flathead Reservation." And in its Reply Brief, the DNRC states:

> Too much attention has been paid to the alleged harms that the Tribes claim will befall them from allowing existing water users the opportunity to prove their case, and not enough attention is being paid to the constitutional rights of the existing water right holders of this state. That is why the DRNC has framed the issue in this case first and foremost in terms of the constitutional right of existing water right holders to change their water rights.

It is also noteworthy that rather than pursue sanctions against the Axes for their noncompliance with § 85-2-402(1), MCA (prohibiting an appropriator from making a change in use without the DNRC's approval), the DNRC is seeking after the fact to ratify that noncompliance.

¶157 These efforts to litigate the interests of state-law water right holders—and in a procedural posture that is adversarial to the Tribes, no less—calls into serious question the DNRC's long-standing position that unquantified tribal water rights are being "adequately protected" by the DNRC. *See Simonich*, 29 F.3d at 1401. Indeed, given the political and economic pressure put on the DNRC, to which it routinely succumbs as demonstrated by its track record over the last twenty years, it is pure fantasy to expect that the agency—which is of the view that "[t]oo much attention has been paid to the alleged harms that the Tribes claim will befall them"—will satisfactorily protect Indian water rights in the course of its proceedings. Decades of one step forward and two steps back have left the Tribes with little recourse but to seek a remedy in the federal court proceedings that have been on hold.

¶158 I would affirm the District Court's grant of summary judgment in favor of the Tribes—albeit based, in part, on a ground not considered by the District Court. I dissent from this Court's contrary decision.


/S/ JAMES C. NELSON


Justice Patricia O. Cotter joins in the dissent of Justice James C. Nelson.


/S/ PATRICIA COTTER